## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IOWA MIGRANT MOVEMENT FOR JUSTICE, JANE DOE, ELIZABETH ROE, | ) ) ) | |
| *Plaintiffs*, | ) ) | Case No.   4:24-cv-161 |
| v. | ) ) ) | |
| ATTORNEY GENERAL OF IOWA BRENNA BIRD, in her official capacity, POLK COUNTY ATTORNEY KIMBERLY GRAHAM, in her official capacity, CLAYTON COUNTY ATTORNEY ZACH HERRMANN, in his official capacity, | ) ) ) ) ) ) ) ) | |
| *Defendants*. | ) ) ) | |

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1. This action challenges Iowa Senate File 2340, which attempts to displace federal immigration law and set up an independent state immigration scheme. 2024 Iowa Acts Senate File 2340 (to be codified as new Iowa Code ch. 718C (2024)) (hereinafter "S.F. 2340"). S.F. 2340 purports to give Iowa state officials broad power to arrest, detain, and deport noncitizens in Iowa who reentered the United States after a previous removal or exclusion. Under this novel system, the State of Iowa has created its own immigration crime which will require state police to identify and arrest noncitizens for alleged violations; state prosecutors to bring charges in state courts; state judges to order deportation; and state officers to facilitate those orders. The federal government has no role in, and no control over, Iowa's immigration scheme.

2. The law makes no exception for people who reentered the United States with federal consent or who later gained lawful immigration status. Nor does the law make an exception for people who are in the process of obtaining immigration status. And the law provides no opportunity to raise humanitarian claims for protection from removal enshrined in federal immigration law and international conventions. People in these situations have explicit federal permission to remain in the country, yet S.F. 2340 directs state officials to nevertheless force them to leave the country or impose additional penalties of up to 10 years in prison.

3. The law makes no exception for people who were removed, deported, excluded, or denied admission and returned as children, nor does it prohibit the prosecution of children.

4. State removals under S.F. 2340 could start as soon as it goes into effect on July 1, 2024. The law allows judges to order people removed at the very beginning of a prosecution if they consent to removal. And the law is structured to coerce people to accept these orders, because if they do not, they face years in a state prison for a S.F. 2340 conviction, followed by a *mandatory* removal order after their sentence. And S.F. 2340 contains no affirmative defenses.

5. S.F. 2340 violates the Supremacy Clause of the United States Constitution. Immigration is a quintessentially federal authority. Congress has created a carefully calibrated immigration system, with detailed procedures that determine whether a person may enter and remain in the United States, when criminal reentry charges may be deployed in the exercise of prosecutorial discretion, and what protections people receive to ensure that they are not removed to a place where they face persecution.

6. Congress placed all of the relevant tools and decision-making in the hands of *federal* officials—in keeping with the federal government's exclusive immigration powers and the

sensitive foreign policy implications of these powers. S.F. 2340 jettisons this system, grasping control over immigration for state and local actors from the federal government and depriving people subject to that system of *all* of the federal rights and process that Congress requires. S.F. 2340 sanctions the state's removal of people whom the federal government has *already authorized* to reenter or remain in the United States. And it denies noncitizens the right to apply for federal immigration benefits, contest removal, and seek federal relief from removal like asylum, withholding of removal, and protection under the Convention Against Torture.

7.   S.F. 2340 is patently illegal. A state cannot replace Congress's immigration scheme with its own. Plaintiffs hereby file this complaint for declaratory and permanent injunctive relief. Plaintiffs seek a preliminary injunction necessary to enjoin enforcement of S.F. 2340 in advance of the law's July 1, 2024 effective date.

## JURISDICTION AND VENUE

8.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

9.   Venue is proper in the Southern District of Iowa because a substantial portion of the relevant events occurred or will occur in the District and because Defendants reside in the District. 28 U.S.C. § 1391(b).

## PARTIES

10.  Plaintiff Iowa Migrant Movement for Justice ("Iowa MMJ") is a statewide membership-based immigration legal service and advocacy organization that is headquartered in Des Moines, Iowa.

11.  Iowa MMJ's mission is to build a movement for justice led by immigrants and refugees in Iowa by providing high-quality legal services and community empowerment through

organizing. They provide legal services to ensure that immigrants and refugees have access to the federal immigration benefits for which they are eligible, maintain the lawful immigration status to which they are entitled, and avoid the separation from family and community and the threat of persecution that results from removal from the United States. Iowa MMJ lifts up immigrant and refugee voices and advocates for policies that protect their foundational rights and allow them to integrate into society in Iowa.

12. Iowa MMJ has approximately 2,300 members. Over 350 of those members are dues-paying and approximately 2,000 members are clients or community members for whom the membership dues are waived. Iowa MMJ members include people who would be subject to prosecution and removal under S.F. 2340.

13. Iowa MMJ member "Anna" is an 18-year-old high school student who was ordered removed as a child, reentered the United States as a child, and was later granted asylum. She lives in Iowa with her family. She would be subject to arrest, prosecution, imprisonment, and removal under S.F. 2340.

14. Iowa MMJ member "David" was brought to the United States by his mother when he was just ten years old. He was deported and returned to the United States shortly after his removal in order to support his mother and his sister, a U.S. citizen, who suffers from serious medical conditions. Under S.F. 2340, he could be arrested, prosecuted, imprisoned, and removed.

15. Plaintiffs Doe and Roe, discussed further at paragraphs 18-19, *infra*, are also Iowa MMJ members.

16. Iowa MMJ's legal services team provides representation and consultations to noncitizens living across Iowa, including by providing six legal clinics each quarter in different regions

of the state and eight legal clinics in Des Moines. In 2023, Iowa MMJ served over 2,400 clients through its legal program. Many of the people it serves have been previously deported and are now in the process of applying for lawful immigration status.

17. Iowa MMJ's advocacy work is designed to center the voices of immigrants and refugees and build a powerful movement for immigrants' rights at all levels. The advocacy team conducts this work through grassroots community organizing and issue campaigns – including campaigns to promote workers' rights and access to community identification documents, communications and messaging to promote narrative change, coalition building, and civic engagement work.

18. Plaintiff Jane Doe is a 68-year-old lawful permanent resident who resides in Garnavillo, Iowa, in Clayton County. Ms. Doe was ordered removed in around 2005 and was deported to Mexico shortly thereafter. Ms. Doe's U.S. citizen husband filed a family petition for Ms. Doe while she was in Mexico, however her husband passed away before the application could be approved, and the application was converted to a widow petition. The federal government approved Ms. Doe's applications for a waiver and for lawful permanent residence, and she returned to the United States in 2022 with federal authorization. Ms. Doe resided in Mexico for 17 years while she awaited approval of those applications.

19. Plaintiff Elizabeth Roe is a 40-year-old lawful permanent resident who resides in Des Moines, Iowa, with her U.S. citizen husband. Roe first came to the United States in 2016 to reunite with her two U.S. citizen brothers. In February 2017, she was ordered removed and deported to her home country of Colombia. She married her U.S. citizen husband in Colombia in 2018, and he filed an immediate relative visa petition on Roe's behalf later that

year. The federal government approved the visa petition and inadmissibility waiver, and Roe returned to Iowa in 2023 to reunite with her husband.

20. Defendant Brenna Bird is the Attorney General of Iowa, the chief legal officer of the State. Iowa Const. art. V, § 12. As such, she is responsible for the enforcement of all Iowa criminal laws including S.F. 2340. Under Iowa law, the Attorney General also oversees the enforcement of the State's criminal statutes by county attorneys. Iowa Code § 13.2(g). The Attorney General is also required to appear in courts on behalf of the State of Iowa and is authorized to act as a county attorney to prosecute criminal proceedings, regardless of whether her assistance is required or requested. Iowa Code §§ 13.2(1)(a)-(d), 331.754(1)-(7). The Attorney General is tasked with supervising and providing training for Iowa county attorneys on changes in the law. The Attorney General is sued in her official capacity.

21. Defendant Bird has publicly stated her strong support for the enforcement of S.F. 2340. She "applaud[ed]" Governor Reynold's enactment of S.F. 2340, claiming that the law "protect[s] Iowans" and that through this law "Iowa is sending a clear message that illegal reentry will not be tolerated." Press Release, Office of the Iowa Attorney General, *Attorney General Bird Applauds Governor Reynolds for Signing Immigration Law* (April 10, 2024), *available at* https://iowaattorneygeneral.gov/newsroom/attorney-general-bird-applauds-governor-reynolds-for-signing-immigration-law. Defendant Bird also stated, "If Biden refuses to stop the border invasion [and] keep our communities safe, [Iowa] will do the job for him." @BrennaBird, X (May 3, 2024, 12:08 PM), https://x.com/BrennaBird/status/1786427577336303750.

22. Defendant Kimberly Graham is the County Attorney of Polk County, Iowa. Iowa Code § 331.756(1). As County Attorney, Defendant Graham must "[d]iligently enforce or cause to

be enforced in the county, state laws and county ordinances" such as S.F. 2340, *id.,* and has a regular practice of enforcing all of Iowa's criminal laws. Defendant Graham is sued in her official capacity.

23. Defendant Zach Herrmann is the County Attorney of Clayton County, Iowa. Iowa Code § 331.756(1). Like Defendant Graham, Defendant Herrmann is tasked with enforcing state laws within the county, such as S.F. 2340, *id.,* and has a regular practice of enforcing all of Iowa's criminal laws. Defendant Herrmann is sued in his official capacity.

## STATEMENT OF FACTS

### A.  Legal Background: Comprehensive Federal Immigration System

24. The federal government has exclusive power over immigration. *See*, *e.g.*, *Arizona v. United States*, 567 U.S. 387, 394-95 (2012).

25. Congress has created a comprehensive system of federal laws regulating and enforcing immigration in the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1101 et seq.

26. Federal immigration statutes and the associated implementing regulations and precedential administrative law decisions form an exceptionally detailed, complex, and finely reticulated regulatory regime. Congress has frequently amended the relevant provisions of the INA, including by passing particularly significant legislation in 1952, 1965, 1980, 1986, 1990, 1996, 2000, 2001, 2005, and 2008, along with dozens of other Acts modifying the immigration regime in countless ways. Immigration legislation is proposed in every single Congress and frequently forms a point of major national debate.

27. Congress has specified categories of noncitizens who may be denied admission to the United States, *see* 8 U.S.C. § 1182, including those who have previously been removed, *see id*. § 1182(a)(9)(A), (C).

7

28. Congress barred noncitizens from seeking admission for a period of five, ten, or twenty years (depending on the type of removal order) following removal, but also provided a mechanism to seek consent to return even during the period of inadmissibility. *See* 8 U.S.C. § 1182(a)(9)(A); 8 C.F.R. § 212.2. Those who receive consent or seek admission after waiting the specified period may reenter via a host of immigrant and nonimmigrant visas and other lawful pathways. *See, e.g.,* 8 U.S.C. § 1153.

29. Congress has established several alternative removal procedures to decide whether a person who reentered unlawfully or attempted to reenter will be removed, including reinstatement of a removal order, 8 U.S.C. § 1231(a)(5), 8 C.F.R. § 241.8; expedited removal proceedings, a shortened form of proceedings applicable to recent arrivals, 8 U.S.C. § 1225(b)(1); and full trial-like removal proceedings subject to administrative and judicial appeals, *id.* § 1229a. Congress also extensively regulated where a noncitizen ordered removed may be sent. *Id.* § 1231(b). Under federal law, people are allowed to remain in the United States while administrative removal proceedings prescribed by the INA are pending.

30. Congress created multiple mechanisms that allow noncitizens to rescind old orders of removal. 8 U.S.C. § 1229a(b)(5)(C), (c)(6), (7).

31. Congress enacted a range of protections that may be pursued affirmatively or in removal proceedings by individuals who reenter unlawfully after being removed. Noncitizens in reinstatement proceedings may seek withholding of removal protection because Congress barred federal officials from removing people to likely persecution or torture, in compliance with the United States' obligations under international treaties. *See* 8 U.S.C. § 1231(b)(3); Foreign Relations Authorization Act, Fiscal years 1998 and 1999, Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231). Except for

people whose removal orders are reinstated, asylum remains available to those who are eligible, regardless of any prior removal order, and can be pursued through multiple mechanisms. 8 U.S.C. §§ 1225(b)(1)(B), 1158(d). Noncitizens who have reentered following a removal order may also apply affirmatively for numerous other forms of relief, including visas for victims of crimes and trafficking, *id.* § 1101(a)(15)(T), (U), temporary protected status, *id.* § 1254a(a), and Special Immigrant Juvenile Status for noncitizens under 21 years of age, *id.* § 1101(a)(27)(J).

32. Congress has established that reentry into the United States without authorization is a crime under certain circumstances. Section 1326 of Title 8 provides criminal penalties for noncitizens who reenter the United States without authorization after entry of an order of removal. 8 U.S.C. § 1326. A different section of the INA also provides criminal penalties for a failure to comply with a federal order of removal. *Id.* § 1253 ("Penalties related to removal").

33. It is not a crime to reenter the United States under 8 U.S.C. § 1326 if the person does so with the consent of the U.S. government via a visa, parole, or other status. 8 U.S.C. § 1326(a)(2).

34. Prosecution for the federal reentry crime, the decision to pursue the removal of a given person from the country, and the choice of which of the available removal processes to invoke, are matters of federal discretion. Federal agents and policymakers may choose to deploy these tools—or not—for a wide range of reasons, including national priorities, migration patterns, international relationships and foreign policy, and humanitarian concerns.

**S.F. 2340**

35. On April 10, 2024, Governor Reynolds signed S.F. 2340 into law. The law goes into effect on July 1, 2024.

9

36. S.F. 2340 creates two new criminal offenses: Illegal Reentry into State by Certain Aliens ("State Illegal Reentry"); and Refusal to Comply With [State] Order to Return to Foreign Nation ("Refusal to Comply").

37. Each of these offenses apply to "[a] person who is an alien." Iowa Code §§ 718C.2(1), 718C.5(1). "Alien" under S.F. 2340 is defined by reference to the INA, which in turn defines an "alien" as any person who is not a citizen or national of the United States. *Id.* § 718C.1(1) (citing 8 U.S.C. §1101).

38. Iowa Code § 718C.2 defines State Illegal Reentry. Section 718C.2 makes it a criminal offense when a noncitizen "enters, attempts to enter, or is at any time found in [Iowa] under any of the following circumstances: a. The person has been denied admission to or has been excluded, deported, or removed from the United States. b. The person has departed from the United States while an order of exclusion, deportation, or removal is outstanding."

39. S.F. 2340 defines "removal" to include an Iowa Order to Return to a foreign nation. *Id.* § 718C.2(3).

40. State Illegal Reentry is an aggravated misdemeanor, punishable by up to two years in state prison. *Id.* § 718C.2(2). Where an individual was previously removed after certain criminal convictions, or based on certain criminal charges or certain broad terrorism inadmissibility grounds, a violation is punishable as a class "D" or "C" felony, authorizing sentences of up to ten years in prison. *Id.* §§ 718C.2(2)(a), 902.9(1)(d). A deferred judgment, deferred sentence, and a suspended sentence are prohibited. *Id.* § 718C.10.

41. S.F. 2340 creates a new state judicial power to deport individuals from the United States. Specifically, it authorizes state judges to issue "an order requiring [the defendant] to return to the foreign nation from which the person entered or attempted to enter." *Id.* § 718C.4(3), (4).

42. Following a conviction for State Illegal Reentry, the state judge must enter an "Order to Return" to the foreign nation from which the person entered or attempted to enter. *Id.* § 718C.4(4). The order must identify: (a) "The manner of transportation of the person to a port of entry[;]" and (b) "The law enforcement officer or state agency responsible for monitoring compliance with the order." *Id.* § 718C.4(5).

43. The state Order to Return takes effect upon the completion of any sentence.

44. Alternatively, a state judge may enter an Order to Return at an individual's initial appearance following arrest for State Illegal Reentry in lieu of continuing the prosecution. After making a determination that probable cause exists, a state judge may issue an Order to Return if the individual agrees to the order and meets certain requirements. *Id.* § 718C.4(1)-(3).

45. Iowa Code § 718C.5 defines Refusal to Comply With [State] Order to Return to Foreign Nation. S.F. 2340 makes it a class "C" felony, punishable by up to 10 years in prison, if a person subject to an Order to Return fails to return to the foreign nation from which the person entered or attempted to enter.

46. S.F. 2340 does not provide for any defenses to State Illegal Reentry or Refusal to Comply With [State] Order to Return to Foreign Nation.

47. It is no defense to prosecution and removal under S.F. 2340 that the noncitizen currently has lawful immigration status.

48. It is no defense to prosecution and removal under S.F. 2340 that the noncitizen returned to the United States after an order of exclusion, deportation, or removal, with the consent of federal immigration authorities.

49. The law specifically prohibits state authorities from abating prosecution for the new illegal reentry crimes on the basis of a pending determination of status. *Id.* § 718C.6.

50. An amendment was proposed to the bill, which would have permitted the abatement of prosecution if the federal government was in the process of determining the person's immigration status. Amendment S-5048 to S.F. 2340, 90th G.A., 2d Sess. (Iowa 2024), *available at* https://www.legis.iowa.gov/legislation/BillBook?ga=90&ba=S-5048.   The amendment specifically applied to someone who "holds or is eligible" for a visa under the Violence Against Women Act because they are a victim of domestic violence. *Id.* The Amendment was defeated, with 17 senators voting for the amendment and 33 voting against. *Id.*

**B.  The Effect of S.F. 2340 on Plaintiffs**

51. S.F. 2340 creates a new state system to regulate immigration that completely bypasses and conflicts with the federal system. It allows state officers to arrest, detain, and remove individuals from the United States and mandates removal for those who are convicted of the new state crimes, all without any direction, input, or involvement whatsoever from federal officials.

52. S.F. 2340 requires state officers to make complex immigration determinations, such as whether individuals have been deported, removed, excluded, or denied admission, and whether they left while an order was outstanding—all without access to the necessary federal documents and databases to do so. The law does not make any exception for people who returned to the United States with federal consent, who later obtained immigration status upon return, or for those in the process of obtaining immigration status.

53. S.F. 2340 does not provide noncitizens with any of the mechanisms or pathways created by Congress to apply for or receive federal protection from removal. Moreover, the system

prohibits state courts from abating prosecution while federal immigration proceedings take place.

54. The law makes no exception for people who were removed, deported, excluded or denied admission as children, or for children who voluntarily left the country with their families after an order of removal had been issued in their case.

55. The law does not prohibit the prosecution of children.

56.  S.F. 2340 will lead to countless wrongful removals because it requires removal without regard to the complex federal scheme for determining whether a person will be removed. Lacking any of the humanitarian protections in federal law, S.F. 2340 will lead people to be removed to countries where they face persecution and violence. And because it takes no account of a person's immigration status, S.F. 2340 will break up families and remove individuals whom the federal government has expressly permitted to reenter the United States, and those who later gained lawful status.

57. These harms will be felt acutely by Iowa MMJ's members and clients. Iowa MMJ's members are subject to prosecution, imprisonment, and removal under S.F. 2340. The organization currently represents more than 2,000 clients with diverse immigration histories, many of whom are seeking or have obtained immigration status for which a prior removal is not a bar – such as U visas, T visas, asylum, SIJS, and VAWA – and as a result many of Iowa MMJ's client members have been previously deported and would be subject to arrest and removal under S.F. 2340.

58. One such client is Iowa MMJ member "Anna". Anna is an eighteen-year-old high school student from Honduras living with family in Iowa. Anna's father was murdered and her older sister kidnapped in Honduras. She first fled to the United States in September 2019 with her

mother and her sister when she was 14 years old. Federal immigration authorities arrested Anna and her family at the U.S.-Mexico border and forced them to undergo removal proceedings in Mexico, under a program called the Migrant Protection Protocols. An immigration judge ordered Anna and her mother removed in January 2020. In February 2020, Anna returned to the United States from Mexico alone, again seeking protection. Federal immigration authorities arrested Anna and sent her to a shelter for unaccompanied children run by the Office of Refugee Resettlement (ORR). In May 2020, ORR released Anna to family living in the United States. Anna submitted an affirmative asylum application, which was approved in March 2021. Anna is now a full-time high school student.

59. If S.F. 2340 goes into effect, Anna will be subject to prosecution, imprisonment, and removal to Mexico. Anna is not a Mexican citizen and does not have family there, but she also cannot return to Honduras, where her father was killed and where she faces persecution. In Mexico, she would be vulnerable to cartel and gang violence. Anna would be separated from her family, unable to graduate from her high school, and risk losing the opportunity to pursue her chosen career path. Without a special travel document issued by federal immigration authorities that authorizes individuals with asylee and refugee status to travel, she might also have difficulty returning to the United States, even though her asylee status allows her to travel abroad and live in the United States. Moreover, the experience of being arrested, incarcerated, and removed for a second time would be extremely traumatic for Anna, who has already experienced significant trauma in her young life.

60. Iowa MMJ member "David" was brought to the United States in 2000 by his mother when he was just ten years old by crossing the U.S.-Mexico border without inspection. His aunt – his mother's sister – was receiving cancer treatment and his mother wanted to help care for

14

her sister. David graduated from high school in Iowa in 2007, but he was deported in 2015. He returned to the United States shortly after his removal in order to support his mother and his sister, a U.S. citizen, who suffers from serious medical conditions. His mother and sister continue to heavily rely on him for support – financial and otherwise. His longtime partner is a U.S. citizen. Under S.F. 2340, he could be arrested, prosecuted, imprisoned, and removed, leaving his mother and sister without needed support and separating him from his family.

61. Enforcement of S.F. 2340 will directly frustrate Plaintiff Iowa MMJ's mission to provide immigration legal services to residents of Iowa. S.F. 2340 will require Iowa MMJ to take on new work, divesting time their staff would normally spend providing the organization's core legal services. This diversion of work would, in turn, impact their grant funding that requires specific deliverables, including the number of clients served.

62. The new law will require Iowa MMJ staff to change their client intake process to screen each prospective client for possible prosecution under S.F. 2340. Reviewing the impact of a new state scheme, in addition to the federal scheme, on prospective clients, will make each case more time-consuming. Further, based on past experience, Iowa MMJ expects that many prospective clients will not recall all of their interactions with immigration authorities or fully comprehend the legal significance of those interactions. Therefore, to accurately assess prospective clients' cases Iowa MMJ will have to submit Freedom of Information Act (FOIA) requests for their complete immigration files to various federal agencies and review those records before the organization can assess whether to provide representation. The process of submitting and receiving a FOIA response could take months.

63. Iowa MMJ will also be harmed by the time-consuming process of reviewing the files of all existing clients – a docket of over 2,000 individuals – many of whom have had applications

for immigration status pending for years. This divergence of resources will again pull staff time away from the organization's core legal work and existing grant deliverables.

64. Additionally, Iowa MMJ will necessarily need to change the way it represents clients subject to prosecution under S.F. 2340. Clients with pending immigration applications will risk having those applications deemed abandoned if they are forced to leave the United States or depart without advance parole (a form of permission to travel) from immigration authorities. The organization will need to pivot resources to submitting requests to expedite pending benefit applications and filing advance parole applications, which usually take about one year to adjudicate.

65. Iowa MMJ staff will also need to learn how to work with clients in Iowa jails or prisons, which is work the organization does not currently engage in. This will require Iowa MMJ staff to learn the state criminal court process and carceral system to adapt representation to the criminal adjudication timeline and gain access to clients in state custody.

66. Iowa MMJ's staff must also become educated on the federal immigration consequences of a conviction under S.F. 2340, because state criminal convictions can bar many forms of federal immigration relief. Iowa MMJ staff will also need to work closely with their clients' criminal defense attorneys to ensure they mount an effective defense under this new law.

67. S.F. 2340 will also impact Iowa MMJ's grant-funded work assisting victims of crime and trafficking with filing U and T visa applications. A prerequisite to obtaining a U or T visa is to cooperate with local law enforcement in the investigation or prosecution of the perpetrator. Once local law enforcement begins enforcing S.F. 2340, immigrant victims of crime and trafficking will likely be afraid to work with local law enforcement, which in turn will interfere with Iowa MMJ's ability to assist them in pursuing U and T visas. If fewer immigrant

victims come forward because of fear of local law enforcement, Iowa MMJ may not be able to fulfill its grant obligations.

68. In addition to the harmful effects S.F. 2340 will have on Iowa MMJ's provision of legal services, the new law will hinder Iowa MMJ's advocacy work by taking time away from their current work. Iowa MMJ's advocacy team has already devoted significant resources to oppose the enactment of S.F. 2340 and to respond to the fear and confusion it has generated since its enactment.

69. As soon as S.F. 2340 passed, Iowa MMJ expanded its efforts to educate the community about its consequences. Iowa MMJ staff members have led both virtual and in-person community meetings with approximately 50-80 attendees at each event. The organization is building a database of statements in opposition to S.F. 2340.

70. Iowa MMJ's advocacy team's work has also been hindered by responding to constant questions from its members and the community about S.F. 2340 and what they should do in response. The organization has created fact sheets and one-page summaries of the law and has been widely distributing Know Your Rights (KYR) materials. Iowa MMJ has frequently shared information through traditional and social media. All of this work is diverting time away from Iowa MMJ's core advocacy work.

71. The mistrust of local law enforcement that will result from S.F. 2340 will affect several of Iowa MMJ's campaigns, including its outreach campaign to workers about the possibility of obtaining protection through a new federal program, Deferred Action for Labor Enforcement (DALE), which is intended to protect immigrant workers from deportation while they participate in labor law violation investigations. The mistrust with local law enforcement will likely result in workers being unwilling to report labor violations.

72. The mistrust of law enforcement will also have a chilling effect on Iowa MMJ's work with local law enforcement to create community IDs, which help immigrants and others who are not eligible for state IDs to better integrate into their communities. As a result of S.F. 2340, immigrant community members will likely hesitate to obtain these IDs if they become available, undermining Iowa MMJ's work to create a more inclusive Iowa.

73. Once S.F. 2340 goes into effect on July 1, Iowa MMJ will also need to expand its KYR work significantly. Under this new law, local law enforcement will be authorized to arrest noncitizens based solely on their immigration history and thus the immigrant community will become a target.

74. This work to counteract the harms caused by S.F. 2340 will take the Iowa MMJ advocacy team staff away from their traditional community outreach activities. Iowa MMJ's advocacy staff will also have to step back from their grassroots leadership development work, efforts regarding workers' rights violations, one-on-one meetings with advocates, and civics engagement activities with new citizens. As a result, S.F. 2340 will undermine Iowa MMJ's work to empower the immigrant and refugee community.

75. Plaintiff Jane Doe is a 68-year-old widow, lawful permanent resident, mother of five children and grandmother of seventeen grandchildren, most of whom reside in Iowa. Doe has experienced anxiety and fear that she will be removed under S.F. 2340 and separated from her family. Doe spent nearly 20 years in Mexico after being removed in 2005, while she awaited federal authorization to return to the United States as a lawful permanent resident. Now that she has returned to the United States and reunified with her family, Doe deeply fears arrest and deportation to Mexico under S.F. 2340.

76. Doe also has concerns about her physical health, as she suffers from hypertension and diabetes. Since returning to the United States in 2022, her health has been stable, largely due to having her family nearby to care for her. Doe worries that the anxiety and her fear of deportation under S.F. 2340 will exacerbate her hypertension and diabetes and negatively impact her overall health.

77. Plaintiff Elizabeth Roe is a 40-year-old lawful permanent resident who resides in Des Moines, Iowa, with her U.S. citizen husband. Roe first came to the United States in 2016 to reunite with her two U.S. citizen brothers and was deported in 2017. She married her U.S. citizen husband in 2018 and waited five years for her immediate relative visa petition and inadmissibility waiver to be approved by the federal government. In 2023, she reentered the United States as a lawful permanent resident and now lives in Des Moines with her husband.

78. After waiting several years to reenter the United States as a lawful permanent resident, Roe fears being arrested, incarcerated, prosecuted, and deported to Colombia under S.F. 2340. She has made a life here in Iowa with her U.S. citizen husband and has a steady job at Amazon. She worries that the life she has worked so hard to build here in Iowa will be shattered if she is prosecuted under S.F. 2340.

## CLAIMS FOR RELIEF

### Count One: Preemption

79. The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof, and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land."

80. Federal law preempts state law in any area over which Congress expressly or impliedly has reserved exclusive authority or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal law.

81. S.F. 2340 violates the Supremacy Clause because it attempts to regulate matters that are exclusively reserved to the federal government and because it operates in a field over which Congress has exercised exclusive authority.

82. S.F. 2340 further violates the Supremacy Clause because it conflicts with federal laws, contradicts federal admission, release, and immigration status decisions, imposes burdens and penalties not authorized by and contrary to federal law, creates its own immigration classifications, and directs state officers to take unilateral immigration enforcement actions.

83. Plaintiffs have an equitable cause of action to challenge S.F. 2340.

## Count Two: Commerce Clause

84. The Constitution gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, sec. 8, cl. 3. The Commerce Clause not only gives Congress this power, but also bars states from interfering with Congress's regulation of interstate or foreign commerce.

85. S.F. 2340 violates the Commerce Clause because it impermissibly regulates people's entry into the United States and their movement across state borders. It therefore prevents the United States from speaking with one voice on matters of foreign commerce, and it imposes unacceptable burdens on interstate commerce.

86. Plaintiffs have an equitable cause of action to challenge S.F. 2340.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs request that the Court grant the following relief:

a.  Declare that S.F. 2340 is unlawful in its entirety;

b.  Preliminarily and permanently enjoin Defendants from enforcing S.F. 2340;

c.  Award attorneys' fees and costs;

d.  Grant any other and further relief that this Court may deem fit and proper.


DATED:  May 9, 2024                      Respectfully submitted,

/s/ Rita Bettis Austen
Rita Bettis Austen, AT0011558
Shefali Aurora, AT0012874
Thomas Story, AT0013130
ACLU of Iowa Foundation Inc.
505 Fifth Avenue, Ste. 808
Des Moines, IA 50309-2317
Phone: (515) 243-3988
Fax: (515) 243-8506
rita.bettis@aclu-ia.org
shefali.aurora@aclu-ia.org
Tomas.story@aclu-ia.org

Emma Winger*
Katherine Melloy Goettel*
Michelle Lapointe*
Suchita Mathur*
Gianna Borroto*
1331 G St. NW, Suite 200
Washington, DC 20005
Phone: (202) 507-7512
ewinger@immcouncil.org;
mlapointe@immcouncil.org
kgoettel@immcouncil.org
gborroto@immcouncil.org
smathur@immcouncil.org

Spencer Amdur*
Cody Wofsy*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
samdur@aclu.org
cwofsy@aclu.org

Anand Balakrishnan*
Wafa Junaid*
Noor Zafar*
Omar Jadwat*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
abalakrishnan@aclu.org
wjunaid@aclu.org
nzafar@aclu.org
ojadwat@aclu.org

*For Plaintiffs Iowa Migrant Movement for Justice,
Jane Doe, Elizabeth Roe*

\* *Pro hac vice* application forthcoming