**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**

| | | |
|---|---|---|
| IOWA MIGRANT MOVEMENT FOR JUSTICE, JANE DOE, ELIZABETH ROE | ) ) ) | |
| *Plaintiffs*, | ) ) | Case No. 4:24-cv-161 |
| v. | ) ) ) | |
| ATTORNEY GENERAL OF IOWA BRENNA BIRD, in her official capacity, POLK COUNTY ATTORNEY KIMBERLY GRAHAM, in her official capacity, CLAYTON COUNTY ATTORNEY ZACH HERRMANN, in his official capacity, | ) ) ) ) ) ) ) | |
| *Defendants*. | ) ) | |

**BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ....................................................................................................... 1

BACKGROUND ........................................................................................................ 2

   A.  The Federal Government Has Exclusive Authority to Regulate Immigration. .................... 2

   B.  Iowa's S.F. 2340 Attempts to Regulate Reentry and Removal. ........................................... 5

STANDARD OF REVIEW ........................................................................................ 6

ARGUMENT .............................................................................................................. 6

   I.  S.F. 2340 is Preempted by Federal Law. .......................................................... 6

     A.  S.F. 2340 Intrudes on the Exclusively Federal Field of Entry and Removal. .................. 7

     B.  S.F. 2340 Conflicts with the Federal Immigration System. .............................................11

   II.  Plaintiffs Will Suffer Irreparable Injury Without an Injunction. ........................................ 18

   III.  The Balance of the Equities and the Public Interest Weigh in Favor of an Injunction. ...... 19

CONCLUSION ........................................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Arizona v. United States*, 567 U.S. 387 (2012) ........................................................ *passim*

*Bank One, Utah v. Guttau*, 190 F.3d 844 (8th Cir. 1999) ........................................... 20

*Biden v. Texas*, 597 U.S. 785 (2022) ................................................................... 4, 16

*Chy Lung v. Freeman*, 92 U.S. 275 (1875) ........................................................... 7, 16

*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) ............................ 6

*De Canas v. Bica*, 424 U.S. 351 (1976) ................................................................... 8

*De La Paz v. Coy*, 786 F.3d 367 (5th Cir. 2015) ...................................................... 10

*Doe v. Miller*, 216 F.R.D. 462 (S.D. Iowa 2003) ...................................................... 18

*Fong Yue Ting v. United States*, 149 U.S. 698 (1893) ................................................. 7

*Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684 (8th Cir. 2003) ................... 18, 19

*Heather K. v. City of Mallard, Iowa*, 887 F. Supp. 1249 (N.D. Iowa 1995) ...................... 19

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ............................................................. 8, 11

*INS v. Yueh-Shaio Yang*, 519 U.S. 26 (1996) ............................................................ 5

*Keller v. City of Fremont*, 719 F.3d 931 (8th Cir. 2013) ......................................... *passim*

*League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998 (W.D. Mo. 2018) ............ 19

*Lok v. INS*, 548 F.2d 37 (2d Cir. 1977) ................................................................ 17

*Lopez-Flores v. DHS*, 387 F.3d 773 (8th Cir. 2004) ................................................... 12

*Matacua v. Frank*, 308 F. Supp. 3d 1019 (D. Minn. 2018) ........................................... 18

*Matter of Alyazji*, 25 I. & N. Dec. 397 (BIA 2011) ................................................... 17

*Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520 (BIA 2011) ....................................... 4

*Matter of Nolasco-Tofino*, 22 I. & N. Dec. 632 (BIA 1999) .......................................... 17

*Matter of Torres-Garcia*, 23 I. & N. Dec. 866 (BIA 2006) ............................................ 12

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................................ 19, 20

*Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) ........................ 10

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) ................................................. 7

*Rodgers v. Bryant*, 942 F.3d 451 (8th Cir. 2019) ...................................................... 20

*Singh v. Gonzales*, 499 F.3d 969 (9th Cir. 2007) ....................................................... 9

*Takahashi v. Fish & Game Comm'n*, 334 U.S. 410 (1948) ........................................ 8, 13

*Texas v. United States*, 50 F.4th 498 (5th Cir. 2022) ................................................... 8

*Toll v. Moreno*, 458 U.S. 1 (1982) ......................................................................... 8

*Truax v. Raich*, 239 U.S. 33 (1915) ..................................................................... 8, 9

*United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012) ........................................ 9, 20

*United States v. Texas*, 2024 WL 861526 (W.D. Tex. Feb. 29, 2024) ............................... 2

*United States v. Texas*, 599 U.S. 670 (2023) ....................................................... 10, 14

*United States v. Texas*, 97 F.4th 268 (5th Cir. 2024) ............................................. *passim*

*Villas at Parkside Partners v. City of Farmers Branch, Tex.*,
    726 F.3d 524 (5th Cir. 2013) ........................................................... 3, 12, 16, 17

## Statutes

2024 Iowa Acts Senate File 2340 (to be codified as new Iowa Code ch. 718C (2024)) ....... *passim*

8 U.S.C. § 1101 .................................................................................................... 2, 9

8 U.S.C. § 1101(a)(15)(T) ........................................................................................... 4

8 U.S.C. § 1101(a)(15)(U) ........................................................................................... 4

8 U.S.C. § 1101(a)(27)(J) ............................................................................................ 4

8 U.S.C. § 1103(a)(1) ................................................................................................. 10

8 U.S.C. § 1103(a)(5) ................................................................................................. 10

8 U.S.C. § 1153 ............................................................................................................ 2

8 U.S.C. § 1157 ............................................................................................................ 2

8 U.S.C. § 1158(d) ....................................................................................................... 4

8 U.S.C. § 1182 ........................................................................................................ 2, 9

8 U.S.C. § 1182(a)(9)(A) ............................................................................................. 2

8 U.S.C. § 1182(a)(9)(C) ............................................................................................. 2

8 U.S.C. § 1225 ...................................................................................................... 3, 4, 9

8 U.S.C. § 1225(b)(1) ............................................................................................... 3, 4

8 U.S.C. § 1229a ....................................................................................................... 3, 9

8 U.S.C. § 1229a(a)(3) ................................................................................................. 9

8 U.S.C. § 1229a(b)(5)(A) ......................................................................................... 12

8 U.S.C. § 1229a(b)(5)(C) ........................................................................................... 3

8 U.S.C. § 1229a(c)(6) ................................................................................................. 3

8 U.S.C. § 1229a(c)(7) ................................................................................................. 3

8 U.S.C. § 1229b ...................................................................................................... 4, 9

8 U.S.C. § 1229b(b) ..................................................................................................... 4

8 U.S.C. § 1229c ........................................................................................................... 9

8 U.S.C. § 1231 ................................................................................................ 3, 4, 9, 15

8 U.S.C. § 1231(a)(1)(A) ........................................................................................... 12

8 U.S.C. § 1231(a)(5) ................................................................................................... 3

8 U.S.C. § 1231(b) ............................................................................................... 3, 4, 15

8 U.S.C. § 1254a(a) ...................................................................................................... 4

8 U.S.C. § 1326 ...................................................................................................... 3, 14

8 U.S.C. § 1326(a)(2)(A) ....................................................................................... 3, 14

8 U.S.C. § 1326(a)(2)(B) ............................................................................................. 3

8 U.S.C. § 1326(d) ....................................................................................................... 3

8 U.S.C. §§ 1151–1382 ................................................................................................ 2

Foreign Relations Authorization Act, Fiscal Years 1998 and 1999, Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231) .................................... 4

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104–208, Div. C, 110 Stat. 3009-546 (1996) ......................................................................................... 10

Immigration and Nationality Act of 1952, Pub. L. No. 414, 66 Stat. 163 (1952) ........................ 10

Iowa Code § 718C.2 ........................................................................................... 5, 6, 13

Iowa Code § 718C.2(1) ....................................................................................... 5, 17

Iowa Code § 718C.2(3) ................................................................................................. 6

Iowa Code § 718C.4 ................................................................................................ 5, 13, 16
Iowa Code § 718C.4(1) ...................................................................................................... 5
Iowa Code § 718C.4(2) ...................................................................................................... 5
Iowa Code § 718C.4(3) ................................................................................................. 5, 15
Iowa Code § 718C.4(4) ................................................................................................. 5, 15
Iowa Code § 718C.4(5) ...................................................................................................... 5
Iowa Code § 718C.5 ..................................................................................................... 6, 16
Iowa Code § 718C.6 ................................................................................................. 6, 13, 17
Iowa Code § 902.9(1)(*d*) .................................................................................................... 6
Refugee Act of 1980, Pub. L. 96–212, 94 Stat. 102 (1980) ............................................. 10

## Regulations

8 C.F.R. § 1241.1 .............................................................................................................. 17
8 C.F.R. § 208.31 ................................................................................................................ 4
8 C.F.R. § 212.2 ............................................................................................................. 2, 14
8 C.F.R. § 214.11(d)(9)(i) .................................................................................................. 4
8 C.F.R. § 214.14(c)(5)(i) .................................................................................................. 4
8 C.F.R. § 241.15 .............................................................................................................. 15
8 C.F.R. § 241.8 ............................................................................................................. 3, 4
8 C.F.R.§ 208.2 .................................................................................................................. 4

## Other Authorities

*Press Release: Gov. Reynolds Signs Several Bills into Law* (Apr. 10 2024),
   https://governor.iowa.gov/press-release/2024-04-10/gov-reynolds-signs-several-bills-law ...... 5

**INTRODUCTION**

Iowa Senate File 2340[1] creates a system in which the *state*—rather than the federal government—arrests, detains, imprisons, and deports noncitizens in Iowa who reentered the United States after a previous removal or exclusion, making no exception for people who reentered the United States with federal consent. Nor does that law make an exception for people who later gained lawful immigration status or are in the process of obtaining immigration status. And the law provides no opportunity to raise humanitarian claims for protection from removal enshrined in federal immigration law and international conventions.

If the law takes effect on July 1, 2024, it will sweep aside the extremely detailed procedures and substantive rights Congress created to govern entry and removal. It will severely disrupt the federal system's balance between criminal enforcement, civil removal, and various forms of relief from removal. It will eliminate the federal Executive's broad discretion over immigration policy and disrupt the United States' sovereign power over foreign relations, most notably with our southern neighbor.

The harms of this unconstitutional law will be immense. Plaintiffs Jane Doe and Elizabeth Roe face arrest, imprisonment, removal, and the trauma of separation from their families, after waiting years to lawfully reunite with them following removal orders. Vulnerable noncitizens seeking safety will face removal to persecution or torture without access to the federally mandated removal process and protections. Communities will endure the arrest, incarceration and summary removal of loved ones. And Plaintiff Iowa Migrant Movement for Justice will see its members prosecuted, its programs derailed, and costs accrue in response to the new and expansive needs of an immigrant community riddled with fear and the threat of

---

[1] 2024 Iowa Acts Senate File 2340 (to be codified as new Iowa Code ch. 718C (2024)) (hereinafter "S.F. 2340"). Plaintiffs cite the to-be-codified sections for ease of reference.

prosecution. S.F. 2340 allows the State to start detaining and removing people immediately once it goes into effect. The Court should enjoin the statute before that date. Courts in the Fifth Circuit recently enjoined a law containing materially identical provisions. *See United States v. Texas*, 97 F.4th 268 (5th Cir. 2024); *United States v. Texas*, 2024 WL 861526 (W.D. Tex. Feb. 29, 2024).

## BACKGROUND

### A.  The Federal Government Has Exclusive Authority to Regulate Immigration.

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). In the Immigration and Nationality Act ("INA"), Congress created a complex system to regulate entry into, authorization to remain in, and removal from the United States. *See generally,* 8 U.S.C. §§ 1101, 1151–1382.

That scheme balances a range of policy goals, including discouraging irregular reentry after removal, offering pathways to return and reunite with family and community following a removal order, and providing for humanitarian and other protections despite prior immigration violations. To do so, Congress granted federal officers a range of tools to regulate immigration, including civil immigration procedures and criminal charges.

Congress has specified categories of noncitizens who may be denied admission to the United States, *see id.* § 1182, including those who have previously been removed, *see id.* § 1182(a)(9)(A), (C). Congress barred noncitizens from seeking admission for a period of five, ten, or twenty years (depending on the type of removal order) following removal, but also provided a mechanism to seek consent to return even during the period of inadmissibility. *See id.* § 1182(a)(9)(A); 8 C.F.R. § 212.2. Those who receive consent or seek admission after waiting the specified period may reenter via a host of immigrant and nonimmigrant visas and other lawful pathways. *See, e.g.,* 8 U.S.C. § 1153, 1157.

2

Unlawful reentry into the country after removal is a federal offense, which includes an exception for those who return with the consent of federal immigration authorities. *Id.* § 1326. This offense is prosecuted in federal court at the discretion of federal officials, subject to rules and exceptions specified by Congress. *Id.* § 1326(a)(2)(A)-(B), (d). People convicted of federal reentry may still be eligible for immigration relief. *See, e.g., Lopez-Chavez v. Garland*, 991 F.3d 960, 962, 965 & n.4 (8th Cir. 2020) (holding that conviction for § 1326 did not render previously-deported noncitizen statutorily ineligible for cancellation of removal).

To decide whether a person who reentered unlawfully or attempted to reenter will be removed, Congress has established several alternative removal procedures, including reinstatement of a removal order, 8 U.S.C. § 1231(a)(5), 8 C.F.R. § 241.8; expedited removal proceedings, a shortened form of proceedings applicable to recent arrivals, 8 U.S.C. § 1225(b)(1); and full trial-like removal proceedings subject to administrative and judicial appeals, *id.* § 1229a. Previously-removed noncitizens who are seeking immigration relief in removal proceedings have federal permission to remain in the country while their immigration proceedings are ongoing. *See Villas at Parkside Partners v. City of Farmers Branch, Tex.,* 726 F.3d 524, 530 (5th Cir. 2013) (plurality opinion) (federal law "contemplates a non-citizen's residence in the United States until potential deportation"). Congress also extensively regulated where a noncitizen ordered removed may be sent. 8 U.S.C. § 1231(b). And Congress created multiple mechanisms that allow noncitizens to rescind old orders of removal. *Id.* § 1229a(b)(5)(C), (c)(6), (7).

Even for those who reenter unlawfully, Congress enacted a range of protections that may be pursued affirmatively or in removal proceedings. Noncitizens in reinstatement proceedings may seek withholding of removal protection, because Congress barred federal officials from

removing people to likely persecution or torture, in compliance with the United States'
obligations under international treaties. *See id.* § 1231(b)(3); Foreign Relations Authorization
Act, Fiscal Years 1998 and 1999, Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-822 (1998)
(codified as Note to 8 U.S.C. § 1231); *see also* 8 C.F.R. §§ 208.31, 241.8(e). Except for people
whose removal orders are reinstated, asylum remains available to those who are eligible,
regardless of any prior removal order, and can be pursued through multiple mechanisms. 8
U.S.C. §§ 1225(b)(1)(B), 1158(d); 8 C.F.R.§ 208.2. In addition, individuals with a prior removal
order who are placed in full removal proceedings may apply for other forms of relief Congress
has extended, including cancellation of removal. 8 U.S.C. § 1229b(b). Noncitizens who have
reentered following a removal order may also apply affirmatively for numerous other forms of
relief, including visas for victims of crimes and trafficking, *id.* § 1101(a)(15)(T), (U), temporary
protected status, *id.* § 1254a(a), and Special Immigrant Juvenile Status for noncitizens under 21
years of age, *id.* § 1101(a)(27)(J). *See, e.g.,* 8 C.F.R. § 214.11(d)(9)(i) (prior orders of removal,
deportation or exclusion are "cancelled" upon approval of T visas); 8 C.F.R. § 214.14(c)(5)(i)
(same for U visas).

      Given the complexities of the immigration system, federal discretion and control is vital.
"A principal feature of the removal system is the broad discretion exercised by immigration
officials." *Arizona*, 567 U.S. at 396. Federal officials "decide whether it makes sense to pursue
removal at all." *Id.* Federal officials choose among the several removal processes Congress
established. *See Biden v. Texas*, 597 U.S. 785, 791-92 (2022); *Matter of E-R-M- & L-R-M-*, 25 I.
& N. Dec. 520, 522 (BIA 2011). Federal officials decide whether to deploy the associated
criminal immigration charges. *See Texas*, 97 F.4th at 281. And once removal procedures have

been initiated, federal officials decide whether to extend relief to otherwise removable noncitizens. *See, e.g.*, *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 30 (1996).

**B.  Iowa's S.F. 2340 Attempts to Regulate Reentry and Removal.**

S.F. 2340 is a blatant attempt to supersede this complex federal system.[2] It establishes two new state crimes that regulate reentry following exclusion, deportation, or removal and direct state officers to effectuate deportations without any room for federal discretion or opportunity to seek protection from removal.

The challenged law creates a new State Illegal Reentry offense, which makes it a crime for a noncitizen to enter, attempt to enter, or be found in Iowa if the person has been denied admission, excluded, deported, or removed from the United States or departed from the United States with an outstanding order of exclusion, deportation, or removal. Iowa Code § 718C.2(1). Unlike the federal reentry crime, it is no defense to this state charge that the person returned with consent of immigration authorities or has subsequently gained lawful immigration status. *Id.*

S.F. 2340 also creates a mechanism for the State of Iowa to unilaterally deport individuals from the United States. If a person is convicted of the new State Illegal Reentry crime, the state judge *must* enter an Order to Return, which requires the defendant "to return to the foreign nation from which the person entered." *Id.* § 718C.4(4). The order must specify how the person will be transported to a port of entry and which Iowa law enforcement agency is responsible for monitoring compliance. *Id.* § 718C.4(5). A state judge may alternatively enter an Order to Return at the beginning of a case if certain conditions are met. *Id.* § 718C.4(1)-(3). Refusal to comply with an Order to Return is a state crime punishable by up to 10 years in prison; there are no

---

[2] *See, e.g.*, *Press Release: Gov. Reynolds Signs Several Bills into Law* (Apr. 10 2024), https://governor.iowa.gov/press-release/2024-04-10/gov-reynolds-signs-several-bills-law ("This bill gives Iowa law enforcement the power to do what [President Biden] is unwilling to do: enforce immigration laws already on the books.").

affirmative defenses. *Id.* §§ 718C.5, 902.9(1)(*d*). In addition to state deportation, S.F. 2340 provides that an "Order to Return" is a predicate deportation for the State's reentry crime. *Id.* § 718C.2(3).

S.F. 2340 specifically prohibits state authorities from abating prosecution for either offense on the basis that a "federal determination regarding the immigration status of the person is pending or will be initiated." *Id.* § 718C.6.

The challenged law thus instructs state law enforcement officers to engage in immigration enforcement even though they have not been trained in federal immigration law and do not have access to federal immigration databases and are therefore not equipped to determine the circumstances under which a noncitizen might have left the United States in the past or the details of their current immigration status. Ex. D, Tupper Decl. ¶ 11. S.F. 2340 thus allows Iowa officials to arrest, imprison, and remove "immigrants that federal authorities do not believe should be removed." *Id.* ¶ 12.

## STANDARD OF REVIEW

A preliminary injunction should be issued where Plaintiffs can demonstrate (1) a likelihood of success on the merits; (2) a threat of irreparable harm absent the injunction; (3) that the threatened injury outweighs any harm that may result from an injunction to the non-movant; and (4) that the injunction will not undermine the public interest. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc).

## ARGUMENT

### I.   S.F. 2340 is Preempted by Federal Law.

S.F. 2340 creates a state system to determine which noncitizens may lawfully reenter and reside in the United States and a process for their removal—quintessentially exclusive federal powers. S.F. 2340 also conflicts with federal law in numerous ways, by eliminating federal

immigration relief, federal discretion, and federal control over immigration classifications and foreign policy. The Fifth Circuit recently held that a state law containing materially identical provisions was likely both field and conflict preempted. *See Texas*, 97 F.4th at 288, 295.

**A. S.F. 2340 Intrudes on the Exclusively Federal Field of Entry and Removal.**

Through S.F. 2340, Iowa has established a brand new state immigration system that entirely bypasses Congress's comprehensive scheme. Iowa has enacted its own law that applies new regulations and criminal penalties for reentry into the United States. And Iowa has claimed the power to deport noncitizens by ordering them to depart the United States on pain of severe additional punishment, and dictated what removal procedures will apply. But immigration is an exclusively federal power, and Congress has long occupied the field of reentry and removal. Therefore, S.F. 2340 is clearly field preempted.

Courts may infer field preemption from either a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or "a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it.'" *Arizona*, 567 U.S. at 399 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

The power to "exclude" and "expel" noncitizens is "an inherent and inalienable right of every sovereign and independent nation." *Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893). As such, for 150 years—ever since Congress began systematically regulating immigration—the Supreme Court has been crystal clear: the regulation of entry into and removal from the United States are exclusively federal matters from which the States are excluded. *See*, *e.g.*, *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875) ("The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not

7

to the States."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—

to admit or exclude aliens—is vested solely in the Federal government."); *Hines v. Davidowitz*,

312 U.S. 52, 62 & n.10 (1941) (noting the "continuous recognition by [the Supreme] Court" of

"the supremacy of the national power . . . over immigration . . . and deportation"); *Takahashi v.

Fish & Game Comm'n*, 334 U.S. 410, 419 (1948) ("The Federal Government has broad

constitutional powers in determining what aliens shall be admitted to the United States [and] the

period they may remain," and "the states are granted no such powers"); *De Canas v. Bica*, 424

U.S. 351, 354 (1976) ("Power to regulate immigration is unquestionably exclusively a federal

power."); *Arizona*, 567 U.S. at 409 ("the removal process is entrusted to the discretion of the

Federal Government").[3]

In light of this unbroken line of precedent, the Eighth Circuit has likewise recognized that

the regulation of who can enter the country and who should be removed are exclusively federal

matters. *See Keller v. City of Fremont*, 719 F.3d 931, 940 (8th Cir. 2013) (noting that

immigration regulation is "unquestionably" an "exclusively [] federal power") (quoting *De

Canas*, 424 U.S. at 354).[4] Other federal courts are in accord. *See, e.g., Texas v. United States*, 50

F.4th 498, 516 (5th Cir. 2022) (because "[p]olicies pertaining to the entry of aliens and their right

to remain here are entrusted exclusively to Congress[,] [a]n attempt by Texas to establish an

---

[3] The federal government's exclusive authority derives from multiple constitutional sources, including its "power to establish a uniform Rule of Naturalization, its power to regulate Commerce with foreign Nations, and its broad authority over foreign affairs," *Toll v. Moreno*, 458 U.S. 1, 10 (1982) (cleaned up, citations omitted); *see also Hines*, 312 U.S. at 62.

[4] The Eighth Circuit held that the rental provisions at issue in *Keller* were not field preempted because they "d[id] not remove aliens from this country (or even the City), nor . . . create a parallel local process to determine an alien's removability." 719 F.3d at 942. The court found that the challenged provisions therefore "d[id] not regulate immigration generally or conduct in the 'field' of alien removal." *Id*. Here, S.F. 2340 does just that, regulating both entry and removal.

alternative classification system . . . would be preempted") (cleaned up); *United States v. Alabama*, 691 F.3d 1269, 1293 (11th Cir. 2012) ("The power to expel aliens has long been recognized as an exclusively federal power.").

Indeed, courts have struck down laws as preempted even when they only indirectly infringe on the federal government's power over entry and removal. *See, e.g.*, *Truax*, 239 U.S. at 42 (state regulation of noncitizens' "opportunity of earning a livelihood" amounted to an impermissible regulation of their "entrance and abode"); *Alabama*, 691 F.3d at 1294-95 (state law limits on noncitizens' ability to enter into contracts reflected a preempted "policy of expulsion"). Here, Iowa has *directly* criminalized reentry and authorized state deportations.

Consistent with this dominant federal interest, Congress's regulation of entry and removal is "pervasive." *Arizona*, 567 U.S. at 399 (internal quotation marks omitted). Through the INA, Congress has established an exceptionally detailed, complex, and finely reticulated regulatory framework governing the admission, adjudication of immigration status and benefits, and removal of noncitizens seeking to reenter and remain in the United States after removal. *See, e.g.*, 8 U.S.C. §§ 1101, 1182, 1225, 1227, 1229a, 1229b, 1229c, 1231; *see also Alabama*, 691 F.3d at 1294 (discussing "Congress's comprehensive statutory framework governing alien removal"). Congress has specifically provided that the INA's provisions shall be "the sole and exclusive procedure" for determining whether a noncitizen "may be admitted to the United States or, if the [noncitizen] has been so admitted, removed from the United States." 8 U.S.C. § 1229a(a)(3). To call the immigration statutes—and their implementing regulations and precedential administrative decisions—comprehensive is an understatement; the immigration laws have "been described as second only to the Internal Revenue Code in complexity." *Singh v. Gonzales*, 499 F.3d 969, 980 (9th Cir. 2007) (internal quotation omitted). And Congress has

frequently amended this statutory scheme, including through multiple significant amendments to the provisions most relevant here. *See De La Paz v. Coy*, 786 F.3d 367, 377 (5th Cir. 2015) (collecting legislative history).[5]

In particular, Congress has extensively regulated how and when noncitizens may reenter and remain in the United States following a removal order, and under what circumstances criminal reentry charges may be deployed against them—the same issues Iowa is attempting to regulate through S.F. 2340. As explained above, the federal scheme sets forth when and how a person who has been previously removed may lawfully return to the United States, creates a federal crime of illegal reentry, provides a variety of civil removal mechanisms with multiple layers of review by federal officials for those who return unlawfully, outlines the countries where a noncitizen may be deported, allows for the reopening of old removal orders, and makes available numerous forms of relief and pathways to lawful status to people who have been previously removed. *Supra* pp. 2-4.

And Congress has given federal officials "broad discretion" to balance these different interests and decide whether it makes sense to detain, remove, or prosecute a noncitizen in the first place. *Arizona*, 567 U.S. at 396; 8 U.S.C. § 1103(a)(1), (a)(5). This discretion is exclusively federal because it "implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives.'" *United States v. Texas*, 599 U.S. 670, 679 (2023) (quoting *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-91 (1999)); *Arizona*, 567 U.S. at 409 (immigration enforcement "touch[es] on foreign relations and must be made with one

---

[5] *See, e.g.*, Immigration and Nationality Act of 1952, Pub. L. No. 414, 66 Stat. 163 (1952); Refugee Act of 1980, Pub. L. 96–212, 94 Stat. 102 (1980); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104–208, Div. C, 110 Stat. 3009-546 (1996). Further changes are proposed in every Congress, and are often a focus of intense national political debate.

voice"). S.F. 2340 wipes away this federal discretion, along with sidestepping the federal removal process and nullifying the many forms of immigration status and relief Congress has provided. Under S.F. 2340, Iowa may arrest, prosecute, imprison, and remove a person from the United States before their removal proceedings are complete, and even if federal immigration authorities have granted them permission to reenter or remain in the United States.

Through the many intricate and interrelated provisions discussed above, Congress has established "a full set of standards governing" who may reenter and remain in the United States, "including the punishment for noncompliance"—a system that is "designed as a 'harmonious whole.'" *Arizona*, 567 U.S. at 401 (quoting *Hines*, 312 U.S. at 72). As such, "States may not enter" this field "in any respect," and "even complementary state regulation is impermissible." *Id*. at 401-02. Probably for that very reason—and because for 150 years the Supreme Court has reiterated that states lack authority over such matters—no state has successfully seized the federal government's prerogatives and set up its own state-law alternative immigration system. S.F. 2340 is field preempted and should be immediately enjoined.

**B.  S.F. 2340 Conflicts with the Federal Immigration System.**

S.F. 2340 is also preempted because it "conflict[s] with federal law." *Arizona*, 567 U.S. at 399. Conflict preemption occurs when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *Hines*, 312 U.S. at 67). Here, S.F. 2340 is an insurmountable obstacle to the fulfillment of multiple of Congress' intentions, as embodied in the INA.

First, S.F. 2340 purports to override federal determinations about noncitizens' immigration status – a quintessential subject of federal control. *See Arizona*, 567 U.S. at 394 ("[T]he United States has broad, undoubted power over . . . the status of aliens."). As noted above, Congress has established various legal statuses that immigration authorities may grant

noncitizens even if they have prior removal orders. The congressional scheme includes affirmative benefits available to people whether or not they are in full removal proceedings, *see supra* pp. 3-4 (describing asylum, temporary protected status, and special visas for abused, neglected or abandoned children and victims of crime and trafficking, adjustment of status), and relief available only to those in removal proceedings, *see id.* (describing withholding of removal, protection under the Convention Against Torture, and cancellation of removal); *see also Arizona*, 567 U.S. at 396. For many of these benefits, old removal orders have no impact on eligibility or are subject to waivers. *See supra* pp. 3-4. Under this complicated web of statutes and federal regulations, many noncitizens with old deportation orders are currently lawfully residing in the United States and have a statutory right to continue to do so. *See, e.g., Lopez-Flores v. DHS*, 387 F.3d 773, 775-77 & n.2 (8th Cir. 2004) (granting petition for review by noncitizen who had been deported, re-entered, and was seeking adjustment of status via discretionary waiver); *Matter of Torres-Garcia*, 23 I. & N. Dec. 866, 872 (BIA 2006) (describing process for previously removed noncitizens to reapply for admission as lawful permanent residents).

To adjudicate these defenses, Congress designed a detailed administrative system for making determinations about when noncitizens already in the United States may receive lawful status and seek relief from removal. In addition to those who have already been granted status, previously-removed noncitizens who have pending removal proceedings have federal permission to remain in the country while their cases are ongoing. *See Farmers Branch, Tex.,* 726 F.3d at 530; 8 U.S.C. §§ 1229a(b)(5)(A) (requiring noncitizens to attend their immigration hearings); 1231(a)(1)(A) (contemplating removal only after noncitizen "is ordered removed" in federal proceedings).

But S.F. 2340 bypasses all the defenses to removal created by Congress and requires state officials to contradict federal law. Under Iowa's law, individuals with status and those with pending proceedings can be prosecuted for doing what they are expressly permitted to do under federal law. Under S.F. 2340, it is not a defense to prosecution or removal that a noncitizen currently has lawful immigration status that, per Congress' directives, allows them to remain in the country. *See generally* Iowa Code § 718C. Nothing in the law prevents the state from imposing criminal penalties, including a prison sentence of years, and ordering the removal *from the United States* of noncitizens who have been granted legal status, are in pending proceedings, or may be eligible for relief under the INA, as long as they have a prior qualifying removal and are subsequently found in Iowa. *Id.* §§ 718C.2, 718C.4, 718C.6.

Indeed, S.F. 2340 identifies and doubles down on this conflict, providing that courts "may not abate the prosecution of an offense under" its criminal provisions "on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." *Id.* § 718C.6. The result is unilateral state nullification of federal determinations about who can reenter and remain in the United States. *See Takahashi*, 334 U.S. at 419 (states "can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states"). Because S.F. 2340 "impermissibly remove[s] a class of" noncitizens without any deference to the federal avenues for granting noncitizens lawful status, *Keller*, 719 F.3d at 941 (cleaned up), it obstructs Congress' objective of allowing certain noncitizens, including those with removal orders, to remain in the United States. *See Texas,* 97 F.4th at 291.

Second, Iowa's new offense frustrates federal interests by subjecting certain noncitizens to arrest, prosecution and imprisonment even though Congress has explicitly excepted them from

criminal liability. *See Arizona*, 567 U.S. at 406 (explaining that where "Congress decided it would be inappropriate to impose criminal penalties on" certain noncitizens, a "state law to the contrary is an obstacle to the regulatory system Congress chose"). S.F. 2340's reentry crime is far broader than 8 U.S.C. § 1326: a noncitizen is not subject to prosecution under the latter if they obtained federal "consent" to seek admission to the United States. 8 U.S.C. § 1326(a)(2)(A). So, for example, a previously-removed noncitizen may request and obtain federal consent to return to the United States through a number of different avenues, like parole or a family- or employment-based visa. *See, e.g.,* 8 C.F.R. § 212.2. That person has not committed a crime under § 1326(a)(2)(A). But the new Iowa law subjects those same people to criminal penalties, and thus impermissibly "prohibit[s] conduct expressly permitted by federal law." *Keller*, 719 F.3d at 943 (cleaned up). The result is that people who the federal government has affirmatively allowed to return to the United States and exempted from federal prosecution are nevertheless criminalized and subject to incarceration and removal by Iowa. This significant "inconsistency" represents a shocking "intrusion upon the federal scheme." *Arizona*, 567 U.S. at 402.

Third, S.F. 2340 frustrates Congress' statutory scheme by preventing federal authorities from exercising discretion over the prosecution, processing, and removal of covered noncitizens. Congress gave federal immigration officials "broad discretion" as a "principal feature" of the immigration system. *Arizona*, 567 U.S. at 396. Federal discretion is critical, because it "implicates not only normal domestic law enforcement priorities but also foreign-policy objectives." *Texas*, 599 U.S. at 670 (internal quotation omitted). The range of tools available to immigration authorities – including discretion to bring criminal reentry charges; to place previously-removed noncitizens in removal proceedings; to afford humanitarian relief; and to make decisions about where removable noncitizens should actually be sent, *see supra* pp. 2-4—

allow the federal government to balance complex and interrelated domestic and international policies and priorities.

Discretion allows federal immigration authorities to distinguish between, for example, noncitizens with "children born in the United States" and "smugglers or [noncitizens] who commit a serious crime," while also weighing whether to remove people to countries "mired in civil war [or] complicit in political persecution." *Arizona*, 567 U.S. at 396. These choices implicate "immediate human concerns" as well as "this Nation's international relations." *Id.* Under S.F. 2340, federal officials no longer "retain complete discretion to decide whether and when to pursue removal proceedings." *Keller*, 719 F.3d at 944. And from a foreign policy perspective, Iowa's law requires removal to one pre-specified country, thereby eliminating federal authorities' ability to decide where they will send removable noncitizens. Iowa Code § 718C.4(3), (4). This is a blatant conflict with the detailed rules about which countries someone may be sent to, which incorporate considerations including a noncitizen's country of birth, place of residence, and nationality, as well as the federal government's relationships with and the preferences of sovereign nations. 8 U.S.C. § 1231(b); 8 C.F.R. § 241.15; *see also Texas*, 97 F.4th at 291 ("Congress has identified the . . . process for selecting the country to which noncitizens may be removed.").

Fourth, S.F. 2340 conflicts with federal law because it squarely inserts Iowa into the relationship between the United States and Mexico and other foreign countries. Determinations about how to prosecute immigration crimes and execute removals to other nations "touch on foreign relations" and "must be made with one voice." *Arizona*, 567 U.S. at 409; *see id.* at 395 ("Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation[.] . . . Perceived mistreatment of aliens in the United States may lead to harmful

15

reciprocal treatment of American citizens abroad."). Here, the risk that unilateral state immigration regulation could "embroil us in disastrous quarrels with other nations" is no longer theoretical, as Iowa proposes to remove people to countries that are not their countries of nationality, without the consent of those sovereign states, and in violation of United States' obligations under international law. *Chy Lung*, 92 U.S. at 280.

S.F. 2340 requires state judges to order noncitizens—regardless of nationality—"to return to the foreign nation from which the person entered," on penalty of even more severe punishment. Iowa Code §§ 718C.4, 718C.5. For many would-be defendants, that will be Mexico. *See Texas*, 97 F.4th at 291. As the Supreme Court recently observed, even the federal government "cannot unilaterally return . . . migrants to Mexico" or other foreign sovereigns. *Texas*, 597 U.S. at 806. The same is true of Iowa. As the Court explained, the federal government's efforts to negotiate such returns with Mexico had "played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration." *Id*. (internal quotation marks omitted). The Court rejected the state's attempt to "tie the hands of the Executive" by allowing a court to supervise such foreign policy negotiations. *Id*. Here, the interference with federally-directed foreign policy is even more flagrant. Rather than supervising federal negotiations, S.F. 2340 purports to cut the United States out entirely, as Iowa—not the federal government—would have to either negotiate with Mexico (and other foreign nations) or ignore that country's wishes altogether and violate its sovereignty. *See Texas*, 97 F.4th at 295-96.

Finally, S.F. 2340 frustrates Congress' intent by granting the state authority to make unilateral decisions regarding a noncitizen's immigration status. "The federal government alone . . . has the power to classify non-citizens." *Farmers Branch, Tex.*, 726 F.3d at 536. Congress

entrusted the power to initiate and adjudicate removal proceedings to "federal officers who have received training in the enforcement of immigration law." *Arizona*, 567 U.S. at 408; 8 C.F.R. §§ 239.1, 1003.1. These trained experts navigate the "labyrinth" of immigration law, *Lok v. INS*, 548 F.2d 37, 38 (2d Cir. 1977), and ensure consistent application across the nation. The new Iowa law places state officials in the "impermissible position" of enforcing state law "based on their immigration status determinations without federal direction and supervision." *Farmers Branch, Tex.,* 726 F.3d at 532 (citing *Arizona*, 567 U.S. at 413).

S.F. 2340 requires Iowa officials untrained in immigration law, *see* Ex. D, Tupper Decl. ¶ 11, to determine whether noncitizens in Iowa have been "denied admission" or departed "while an order of exclusion, deportation, or removal is outstanding." Iowa Code § 718C.2(1). In contrast to the rental provision at issue in *Keller*, the new Iowa law impermissibly *requires* "local officials to determine whether a [noncitizen] is removable from the United States" and does not permit them to defer to federal determinations of who may remain. 719 F.3d at 944; *see* Iowa Code § 718C.6. This analysis necessitates access to a person's complete immigration file, often housed at different federal agencies and potentially going back decades, and it requires the expertise to identify the legally significant records. *See* Ex. C, Johnson Decl. ¶ 29; *see Matter of Nolasco-Tofino*, 22 I. & N. Dec. 632, 637 (BIA 1999) (Congress replaced exclusion and deportation proceedings with removal proceedings in 1996). It likewise requires an understanding of immigration law, including the meaning of "admission," *see Matter of Alyazji*, 25 I. & N. Dec. 397, 401 (BIA 2011) (discussing the many meanings of "admission"), and what constitutes a final order of removal, *see* 8 C.F.R. § 1241.1. Iowa officials are unequipped to make these determinations and, without direction from federal authorities, will "impermissibly interfere with the federal regulation of alien removal." *Keller*, 719 F.3d at 944–45.

II.     **Plaintiffs Will Suffer Irreparable Injury Without an Injunction.**

Absent an injunction, beginning July 1, Plaintiffs Jane Doe and Elizabeth Roe and Iowa

MMJ members will suffer irreparable harm by being placed at immediate risk of arrest,

prosecution, detention, and removal under a state statute that is preempted by federal law. Ms.

Doe and Ms. Roe are both lawful permanent residents: Ms. Doe, a widow, lives in Iowa with her

daughters and 17 U.S. citizen grandchildren and Ms. Roe lives with her U.S. citizen husband,

close to her U.S. citizen brothers. Ex. A, Doe Decl. ¶¶ 2, 4, 16; Ex. B, Roe Decl. ¶¶ 2, 14-15.

Both waited many years to return to the United States lawfully after being deported and now face

being separated again from their families. Ex. A, Doe Decl. ¶¶ 11-15, 17; Ex. B, Roe Decl. ¶¶ 9-

13. In addition, Ms. Doe suffers from diabetes and hypertension, and the stress of arrest,

prosecution, imprisonment and removal would put her health further at risk. Ex. A, Doe Decl. ¶¶

18-19. Iowa MMJ member "Anna" is an 18-year-old high school student who has been granted

asylum after being ordered deported and returning to the United States as a child. Ex. C, Johnson

Decl. ¶ 20. If prosecuted under S.F. 2340, Anna would endure the trauma of being separated

from her family, be unable to graduate from her high school, risk losing the opportunity to pursue

her chosen career path, and face removal to Mexico, where she has no family. *Id.* ¶¶ 20-21. Iowa

MMJ member "David" also faces state prosecution and separation from his family, including his

U.S. citizen sister whom he supports, and the country that has been his home since he was a

child. *Id.* ¶ 22. Each threatened injury, standing alone, would warrant a finding of irreparable

harm. *See Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003)

(upholding finding of irreparable harm based on the risk of "trauma to already troubled

children"); *Doe v. Miller*, 216 F.R.D. 462, 470–71 (S.D. Iowa 2003) (finding irreparable harm

based on "an immediate or imminent threat of criminal prosecution"); *Matacua v. Frank*, 308 F.

Supp. 3d 1019, 1025 (D. Minn. 2018) (holding "a loss of liberty . . . is perhaps the best example

of irreparable harm"); *Heather K. v. City of Mallard, Iowa*, 887 F. Supp. 1249, 1260 (N.D. Iowa

1995) (threat to health is irreparable harm). Together they indisputably support an injunction.

If S.F. 2340 is allowed to go into effect, Plaintiff Iowa MMJ will be forced to divert

significant resources to counteract the harms caused by the law, undermining its ability to pursue

core programs central to its mission.  Iowa MMJ legal services staff will need to screen

prospective and existing clients for possible prosecution under S.F. 2340, adapt their immigration

practice to represent clients facing prosecution under S.F. 2340, and assist clients who are

prosecuted under the law, taking staff away from providing their existing, core immigration legal

services and threatening their grant funding. Ex. C, Johnson Decl. ¶¶ 25-35. Iowa MMJ will also

be unable to serve immigrants who would otherwise be eligible for immigration relief based on

their status as victims of crime, because they will be afraid to report crimes to local law

enforcement. *Id.* ¶ 34. Likewise, Iowa MMJ's advocacy team has already spent, and will

continue to spend, significant time educating the community regarding S.F. 2340 and sharing

Know Your Rights information, so that they are unable to meet their existing metrics for

grassroots community outreach. *Id.* ¶¶ 38-41, 44-45. Moreover, S.F. 2340 threatens Iowa MMJ's

ongoing advocacy issue campaigns. *Id.* ¶¶ 42-43. This harm is irreparable. *See Heartland Acad.*

*Cmty. Church*, 335 F.3d at 690 (upholding finding of irreparable harm based on "the threat to [an

institutional plaintiff] and its mission"); *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp.

3d 998, 1005 (W.D. Mo. 2018) (finding irreparable harm where "non-profit organizations . . .

diverted resources from other activities crucial to their missions in order to address" the harm).

## III.    The Balance of the Equities and the Public Interest Weigh in Favor of an Injunction.

The balance of equities tips decisively in favor of the Plaintiffs and an injunction is

strongly in the public interest. When the Defendants are governmental actors, the third and fourth

factors merge and are properly considered together. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

First, the State has no interest in enforcing an unconstitutional law. *Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019) (finding an injunction appropriate when the challenged statute was plainly unconstitutional).  S.F. 2340 intrudes on the federal government's entry and removal authority, and contradicts federal law in a host of ways.  The State has no legitimate interest in enforcing laws that are preempted under the Supremacy Clause.  *See Bank One, Utah v. Guttau,* 190 F.3d 844, 847–48 (8th Cir. 1999) (plaintiff who showed preemption and irreparable harm was entitled to injunction, because "the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law").

Second, S.F. 2340 harms the public interest by requiring the removal of even those noncitizens who have federal permission to remain in the country, and without regard for federal humanitarian protections.  *See supra* 11-17 (laying out these conflicts with federal law).  The "[f]rustration of federal statutes and prerogatives [is] not in the public interest." *Alabama*, 691 F.3d at 1301.  And "there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436.  Moreover, S.F. 2340 harms the public interest by eroding immigrant community trust in local law enforcement, so that crimes will go unreported and unprosecuted, victims will be prevented from seeking protection, and survivors will be denied access to federal immigration benefits to which they are entitled. Ex. D, Tupper Decl. ¶¶ 14-16; Ex. C, Johnson Decl. ¶¶ 34, 42; Ex. E, Corona Decl. ¶¶ 35-46; Ex. F, Meyer Decl. ¶¶ 7, 10. Enjoining those harms is plainly in the public interest.

## CONCLUSION

For the foregoing reasons, the Court should issue a preliminary injunction.

DATED:  May 10, 2024                    Respectfully submitted,

/s/ Emma Winger
Emma Winger*
Katherine Melloy Goettel**
Michelle Lapointe*
Suchita Mathur**
Gianna Borroto***
AMERICAN IMMIGRATION COUNCIL
1331 G St. NW, Suite 200
Washington, DC 20005
Phone: (202) 507-7512
ewinger@immcouncil.org;
kgoettel@immcouncil.org
mlapointe@immcouncil.org
smathur@immcouncil.org
gborroto@immcouncil.org

Rita Bettis Austen, AT0011558
Shefali Aurora, AT0012874
Thomas Story, AT0013130
ACLU of Iowa Foundation Inc.
505 Fifth Avenue, Ste. 808
Des Moines, IA 50309-2317
Phone: (515) 243-3988
Fax: (515) 243-8506
rita.bettis@aclu-ia.org
shefali.aurora@aclu-ia.org
Tomas.story@aclu-ia.org

Spencer Amdur***
Cody Wofsy***
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
samdur@aclu.org
cwofsy@aclu.org

Anand Balakrishnan***
Wafa Junaid***
Noor Zafar***
Omar Jadwat***

21

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
abalakrishnan@aclu.org
wjunaid@aclu.org
nzafar@aclu.org
ojadwat@aclu.org

*For Plaintiffs Iowa Migrant Movement for Justice,
Jane Doe, Elizabeth Roe*

\* Admitted *pro hac vice*
\*\* *Pro hac vice* motion pending
\*\*\* *Pro hac vice* motion forthcoming

CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing paper and accompanying exhibits with the Clerk of Court by using the CM/ECF system.

The foregoing paper will also be served along with the Complaint and Summons to all Defendants.

Date: May 10, 2024

 /s/ Emma Winger
Emma Winger
American Immigration Council
1331 G St. NW, Suite 200
Washington, DC 20005
Phone: (202) 507-7512
ewinger@immcouncil.org
