# EXHIBIT C

Declaration of Erica Johnson, Iowa Migrant
Movement for Justice

## DECLARATION OF ERICA JOHNSON
## IOWA MIGRANT MOVEMENT FOR JUSTICE

I, Erica Johnson, pursuant to 28 U.S.C. § 1746, declare as follows:

1.   I make this declaration based on my personal knowledge except where I have indicated

otherwise. If called as a witness, I could and would testify competently and truthfully.

2.   I am the Founding Executive Director of Iowa Migrant Movement for Justice (Iowa

MMJ). I have been in this role with Iowa MMJ since its inception in April 2021.  Prior to taking

this position, from 2017 through 2021, I was Program Director at American Friends Service

Committee Iowa (AFSC Iowa), managing the Immigrant Rights Program and leading AFSC

Iowa's advocacy and organizing efforts. From 2014 to 2017, I was Advocacy Director at the

ACLU of Iowa.

3.   Iowa MMJ is a statewide membership-based advocacy and legal services organization

that provides free or low-cost legal services and adopts a community-based model to empower

local immigrant and refugee communities. Our headquarters are in Des Moines, Iowa. Iowa

MMJ was founded in 2021, uniting the programmatic work and staff from two well-established

nonprofit organizations, AFSC Iowa's Immigrant Rights Program (founded in 1995) and Iowa

Justice for Our Neighbors (founded in 2000) to meet urgent needs for direct services while

building a stronger movement for immigrants' rights in the state and region. Iowa MMJ is an

affiliate of several national immigrants' rights networks.

**Iowa MMJ's Mission & Programs**

4.   Iowa MMJ's mission is to build a movement for justice led by immigrants and refugees

in Iowa by providing high-quality legal services and community empowerment through

organizing. We provide legal services to ensure that immigrants and refugees have access to the

federal immigration benefits for which they are eligible, maintain the lawful immigration status

1

to which they are entitled, and avoid the separation from family and community and the threat of persecution that results from removal from the United States. We lift up immigrant and refugee voices and advocate for policies that protect their foundational rights and allow them to integrate into society in Iowa.

5.   Iowa MMJ has a staff of twenty. Our legal services team is comprised of three full time attorneys, one part-time attorney, five Department of Justice accredited representatives who are authorized to represent people before the immigration agencies, two soon-to-be accredited representatives, two legal services full-time administrative support staff, and two administrative support staff who spend half their time supporting the legal services team and the other half support Iowa MMJ's other programmatic and administrative work. Our advocacy and organizing staff include two community organizers and myself. We have two additional operations staff.

*Legal Services*

6.   Iowa MMJ's legal services team provides immigration representation and consultations to noncitizens living across Iowa. We regularly represent people or assist in application preparations for the following types of cases: Family-based immigration; Deferred Action for Childhood Arrivals (DACA)[1]; Temporary Protected Status (TPS)[2]; Violence Against Women Act

---

[1] DACA is a type of deferred action, along with authorization to work, that is available to certain noncitizens who entered the United States as children. https://www.uscis.gov/DACA.

[2] TPS is a temporary status available to certain noncitizens from designated countries plagued with natural disasters or civil strife. https://www.uscis.gov/humanitarian/temporary-protected-status.

(VAWA) immigration-related benefits[3]; U-visas[4]; T-visas[5]; Special Immigrant Juvenile Status

(SIJS), including for Unaccompanied Minors[6]; Humanitarian Parole[7]; Follow-To-Join[8]; Special

Immigrant Visas[9]; Family Reunification[10]; Affirmative Asylum; Removal defense, including

defensive asylum, cancellation of removal, and termination of proceedings; work authorizations;

and Naturalization and Citizenship.

7.   Iowa MMJ serves immigrants throughout Iowa, including rural areas with large

immigrant populations and few legal services providers. We offer six legal clinics each quarter in

different regions in Iowa, funded through two specific grants. Our regional clinic team consists

of two staff attorneys and two accredited representatives. Given our limited resources, only one

staff member from this team attends each regional clinic and we are able to offer five

appointments per clinic. In addition to the regional clinics, we offer eight legal clinics each year

---

[3] The VAWA may provide a path to lawful permanent resident status (a green card) for abused spouses, children, or parents of U.S citizens and lawful permanent residents. https://www.uscis.gov/humanitarian/abused-spouses-children-and-parents .

[4] A U visa is available to victims of certain serious crimes who cooperate with law enforcement. https://www.uscis.gov/humanitarian/victims-of-criminal-activity-u-nonimmigrant-status.

[5] A T visa is available to certain victims of human trafficking who cooperate with law enforcement. https://www.uscis.gov/humanitarian/victims-of-human-trafficking-t-nonimmigrant-status.

[6] SIJS is available to certain abused, abandoned, or neglected immigrant children. https://www.uscis.gov/working-in-US/eb4/SIJ.

[7] Noncitizens may request parole to enter the United States based on urgent humanitarian or significant public benefit reasons. https://www.uscis.gov/humanitarian/humanitarian_parole.

[8] People who are granted asylum may file a petition to allow their spouse and children to join them in the United States as asylees. https://www.uscis.gov/i-730.

[9] Special Immigrant Visas allow Afghans who were employed by the U.S. government to immigrate to the United States. https://travel.state.gov/content/travel/en/us-visas/immigrate/special-immg-visa-afghans-employed-us-gov.html.

[10] The Family Reunification Parole process is available to certain individuals from certain countries who are the beneficiaries of a family-based visa petition to enter the United States to wait under their family-based immigrant visa becomes available. https://www.uscis.gov/FRP.

in Des Moines. There is tremendous demand for our services and often our clinic spots fill up within minutes.

8.   We also intake clients through numerous mechanisms, including operating a special hotline for immigrant victims of domestic violence, grant-funded work to provide immigration legal services to victims of crime, referrals from partner organizations to assist with naturalization applications under a grant from U.S. Citizenship and Immigration Services, an Office of Refugee Resettlement-funded program to work with Afghan evacuees, and a rolling program to represent individuals with DACA.

9.   As a result of our efforts, in 2023, our legal services team conducted 1,234 new intakes. Of those, we took on 1,028 as new clients. Including existing clients, Iowa MMJ served over 2,400 clients through our legal program in 2023.

*Advocacy*

10. Iowa MMJ's advocacy work is designed to center the voices of immigrants and refugees and build a powerful movement for immigrants' rights. We conduct this work in four areas.

11. Grassroots community organizing and issue campaigns: To meet our mission to lift up immigrant voices, we engage in extensive relationship building through one-on-one meetings, Iowa MMJ-hosted gatherings at neighborhood residences, and other events with community members. These meetings enable us to learn what issues immigrant communities in Iowa care about and guide our issue campaigns, which are the specific advocacy areas to which we dedicate our work.

12. Our issue campaigns inform the rest of our work. We have a campaign to combat workers' rights violations. We empower immigrant workers to challenge wage theft and other workplace abuses and assist them in reporting crimes. We lead another campaign to expand

access to community IDs. We have engaged in extensive advocacy to enable immigrant communities in Polk County, Iowa to obtain local IDs to present as a form of identification.

13. Narrative change: We deploy communications and messaging to promote conversations to move Iowa towards becoming a more welcoming and inclusive community that protects the rights of immigrants.

14. Coalition building: For ten years Iowa MMJ and its predecessor organizations have hosted monthly state-wide strategy calls to address immigrants' rights with a broad range of coalition partners. During the state legislative session we host weekly strategy calls. Since the state legislature passed S.F. 2340, we have hosted a bi-weekly call to discuss strategy in response.

15. Civic engagement: We encourage civic engagement by working with our newly naturalized citizen clients to help them register to vote and become actively engaged citizens and informed voters.

**Iowa MMJ Membership**

16. Iowa MMJ is a membership-based organization. Pursuant to our bylaws, members elect Iowa MMJ's Board of Directors in an annual membership meeting. In addition, Iowa MMJ's leadership regularly meets with membership to discuss strategy and the direction of our work.

17. Iowa MMJ has three categories of membership. Individuals from impacted immigrant communities, which includes our clients, may become members at no cost. Individual dues-paying members must donate at least $25/per year. Families and groups may join by donating at least $50/per year.

18. At present, Iowa MMJ has over 350 dues-paying members. In addition, we have approximately 2,000 clients/impacted community members.

**Impact of S.F. 2340 on Iowa MMJ Members**

19. We currently represent over 2,000 clients with diverse immigration histories, many of whom are seeking or have obtained immigration status for which a prior removal is no bar – such as U visas, T visas, asylum, SIJS, and VAWA – and as a result many of our client members have been previously deported and would be subject to arrest, incarceration and removal under S.F. 2340.

20. Iowa MMJ member Anna[11] is an eighteen-year-old high school student from Honduras living with family in Iowa. Anna's father was murdered and her older sister kidnapped in Honduras. She first fled to the United States in September 2019 with her mother and her sister when she was 14 years old. Federal immigration authorities arrested Anna and her family at the U.S.-Mexico border and forced them to undergo removal proceedings in Mexico, under a program called the Migrant Protection Protocols. An immigration judge ordered Anna and her mother removed in January 2020. In February 2020, Anna returned to the United States from Mexico alone, again seeking protection. Federal immigration authorities arrested Anna and sent her to a shelter for unaccompanied children run by the Office of Refugee Resettlement (ORR). In May 2020, the ORR shelter released Anna to family living in the United States. Anna submitted an affirmative asylum application, which was approved in March 2021. Anna is now a full-time high school student who enjoys participating in extracurricular activities. She would like to join the National Guard when she graduates.

21. If S.F. 2340 goes into effect, Anna will be subject to prosecution, imprisonment, and removal to Mexico. Anna is not a Mexican citizen and does not have family there, but she also cannot return to Honduras, where her father was killed and where she faces persecution. In

---

[11] Anna is a pseudonym.

Mexico, she would be vulnerable to cartel and gang violence. Anna would be separated from her family, unable to graduate from her high school, and risk losing her opportunity to pursue her chosen career path. Without a special travel document issued by federal immigration authorities that authorizes individuals with asylee and refugee status to travel, she might also have difficulty returning to the United States, even though her asylee status allows her to travel abroad and live in the United States. Moreover, the experience of being arrested, incarcerated, and removed for a second time would be extremely traumatic for Anna, who has already experienced significant trauma in her young life.

22. Another Iowa MMJ member, David,[12] was brought to the United States in 2000 by his mother when he was just ten years old by crossing the U.S.-Mexico border without inspection. His aunt – his mother's sister – was receiving cancer treatment and his mother wanted to help care for her sister. David graduated from high school in Iowa in 2007, but he was deported in 2015. He returned to the United States shortly after his removal in order to support his mother and his sister, a U.S. citizen, who suffers from serious medical conditions. His mother and sister continue to heavily rely on him for support – financial and otherwise. His longtime partner is a U.S. citizen. Under S.F. 2340, David could be arrested, prosecuted, imprisoned, and removed by the State of Iowa.

23. Plaintiff Jane Doe is a member of Iowa MMJ.

24. Plaintiff Elizabeth Roe is a member of Iowa MMJ.

**Impact of S.F. 2340 on Iowa MMJ's Legal Services Program**

25. If S.F. 2340 goes into effect it will have a dramatic effect on Iowa MMJ's legal services practice, forcing us to take on entirely new work and cutting into time our staff would normally

---

[12] David is a pseudonym.

spend providing our core legal services. Our work is funded by numerous grants with specific deliverables, including the number of clients served. S.F. 2340 will interfere with our ability to meet those deliverables, threatening Iowa MMJ's funding and ability to continue our work.

26.  Iowa MMJ's immigration representation practice is an important aspect of our immigrant justice work which, until the passage of S.F. 2340, took place within the federal immigration system. Under S.F. 2340, our clients will be subject to a brand-new immigration system run by Iowa law enforcement officers, which will force us to alter our practices significantly to address this new threat.

27. First, we will be required to change our client intake process to screen each prospective client for possible prosecution under S.F. 2340. This new screening process will take staff time away from traditional immigration legal services work. Iowa MMJ must undertake these efforts to fulfill the duty of informed representation, gauge the complexity of each prospective client's case, determine whom to prioritize given the organization's limited capacity, and ascertain whether a prospective client may be imprisoned and deported by the State of Iowa before we can finish pursuing their application for federal immigration benefits or relief.

28. The new intake analysis will be substantially different from our current review and will result in a much more time-consuming process. For example, when we currently assist clients with renewing their legal permanent resident status, we only review for eligibility for this federal benefit and whether filing the application would prejudice their current federal immigration status. We only inquire into the details of each departure and return if it would disqualify them from a form of relief for which they would otherwise be eligible. Under S.F. 2340, we would need to review clients' entire immigration history in far more detail to determine the risk of

8

prosecution by Iowa law enforcement officials, even if that history would be irrelevant to any relief we would be requesting of the federal government.

29. Currently, we are able to assist over 1,000 new clients every year because of a fairly straightforward intake process. The more extensive screening required under S.F. 2340 will be significantly more labor intensive. In our experience, most prospective clients do not recall all of their interactions with immigration authorities or fully comprehend the legal significance of those interactions and therefore will be unable to accurately report whether they were denied admission or were or are subject to a final order of exclusion, deportation, or removal. Therefore, Iowa MMJ will have to submit Freedom of Information Act (FOIA) requests for their complete immigration files and review those records before we can make a decision regarding whether we can accept a case for full representation and advise new and prospective clients about the threat of prosecution under S.F. 2340. Submitting FOIA requests to various federal agencies, waiting months for those records to return, and reviewing those records means it will take significantly more time to process new cases – a delay that may deter prospective clients from accepting our services. This new process will also slow the intake of new clients we can accept for representation and take staff time away from existing legal services work. It will impact our ability to serve as many clients, will directly affect our organizational goals of expanding access to lawful immigration pathways in Iowa, and threaten our grant funding.

30. Second, in addition to screening new clients, we will need to go back through the files of all our existing clients – a docket of over 2,000 individuals – many of whom have had applications for immigration status pending for years. Many of these existing cases take up little or no legal staff time right now because the work to put together the application has been completed and we are simply waiting for an interview or adjudication by federal authorities. This

allows us to take on new clients. The new review process would be very time-consuming work, involving a review of each client's entire immigration file to determine whether they have ever in the past been denied admission or ordered excluded, deported, or removed, even where that fact would have no impact on their pending immigration application. This will affect staff members' ability to undertake representation in such cases as the client's potential removal would undermine the time and effort spent by Iowa MMJ which could have been allocated elsewhere.

31. Third, as discussed, a significant number of our clients and members will be subject to prosecution for illegal reentry and subsequently face orders of removal under S.F. 2340. Therefore, as part of our responsibility to our clients and members, the Iowa MMJ legal team will have to take on new work to adequately represent these existing clients who face this new risk of state immigration enforcement. This work will similarly take up significant staff time that would otherwise have been spent on our existing legal services work.

32. If charged under S.F. 2340, our clients would be at risk of being ordered removed under a state deportation system. This will change the way we represent our clients in their federal immigration cases. Those with pending immigration applications will risk having those applications deemed abandoned if they are forced to leave the United States. Other statuses, such as TPS and DACA, are also deemed abandoned if the person departs without advance parole (a form of permission to travel) from immigration authorities; and advance parole requests can take more than one year to process. We will need to submit requests to expedite adjudications where such requests are available and seek advance parole for those clients who will need it (and move to expedite those requests as well). For those existing clients who are taken into state custody, it will be especially urgent to submit or expedite applications. We will also be forced to figure out how to work with clients in Iowa jails or prisons – something we have not previously done. As

such, we will need to learn about the state criminal court process and carceral system, so that we can adapt our representation to the criminal adjudication timeline and gain access to our clients in state custody. Iowa MMJ's staff must also become educated on the federal immigration consequences of a conviction under this new offense, because criminal convictions can bar many forms of immigration relief. Incorporating S.F. 2340 into our immigration practice will require additional time to be devoted to learning the scope of S.F. 2340, how it is implemented, and its consequences, and adapting our practice accordingly.

33. Conversely, in order to ensure our clients charged under S.F. 2340 receive an adequate defense, we will likely need to assist our clients' and members' criminal defense attorneys in this defense. Iowa MMJ's core goals of advancing immigrant justice, obtaining lawful status for its members, and preventing the unjust removal of immigrants cannot be achieved without accounting for a law that threatens to disrupt all three of those principles. Currently, the Iowa Office of the State Public Defender only funds one attorney as an immigration expert. S.F. 2340 imposes state criminal penalties based on immigration history and we will need to advise our clients' defense counsel about possible defenses that may arise under federal immigration law, such as whether the person is subject to a final order of removal, what constitutes a "denial of admission" under federal immigration law, what constitutes a "denial of admission" under S.F. 2340, and whether brief, authorized travel outside of the United States amounts to a departure under federal immigration law. This work will include creating educational materials and hosting training sessions that inform criminal defense attorneys of possible defenses under federal immigration law and explain the immigration consequences of S.F. 2340. Iowa MMJ considers such advisals and education a critical part of our work, because the consequence of a conviction

under S.F. 2340 is not just incarceration but also deportation and the legal services' team goal has always been to defend against the wrongful removal of our clients.

34. Fourth, our work assisting victims of crime with U or T visas will be impacted. A prerequisite to obtaining a U or T visa is to cooperate with local law enforcement in the investigation or prosecution of the perpetrator. Once local law enforcement begins enforcing S.F. 2340, immigrant victims of crime and trafficking will be afraid to work with police, which in turn will interfere with our ability to assist them in pursuing the immigration benefits to which they would otherwise be entitled. In fact, legislators rejected a proposed amendment to S.F. 2340 to protect victims of domestic violence seeking federal immigration benefits, making clear that the law is intended to target this vulnerable population and making our clients' fears very reasonable.[13] Moreover, our work with crime victims is funded by two grants – for one we receive funding per client and for the other we have specific deliverables; because fewer survivors will feel empowered to come forward, we will lose clients, be unable to meet our deliverable, and bring in less funding.

35. All this new work expanding our intake process, screening existing clients, adapting our practice to represent clients facing prosecution under S.F. 2340, and assisting criminal defense counsel in those prosecutions, will take Iowa MMJ legal services staff away from existing work, such as representing lawful permanent residents in their naturalization applications, helping those with DACA renew their status, representing Afghan evacuees, and reducing the number of new clients we can represent, undermining our goal to expand legal services access across Iowa.

**Impact of S.F. 2340 on Iowa MMJ's Grassroots Advocacy Program**

---

[13] Amendment S-5048 to S.F. 2340, 90th G.A., 2d Sess. (Iowa 2024), *available at* https://www.legis.iowa.gov/legislation/BillBook?ga=90&ba=S-5048.

36. Iowa MMJ's advocacy team will also have to restructure its operations in response to S.F. 2340. The team has already devoted significant resources to opposing the enactment of S.F. 2340 and respond to the fear and confusion it has generated since its enactment.

37. Iowa MMJ advocated vigorously against S.F. 2340 during the legislative session, by coordinating weekly calls with partner organizations to plan a response, reaching out to interested stakeholders, drafting a policy one-pager describing the law and its harms, and helping the community participate in the legislative process by emailing and calling their representatives.

38. As soon as S.F. 2340 passed, Iowa MMJ expanded our efforts to educate the community about its consequences. Iowa MMJ staff members have led both virtual and in-person community meetings with approximately 50-80 attendees at each event.

39. The advocacy team is responding to constant questions from our members and the community asking about the law and what they should do in response. To educate the community, we have created fact sheets and one-page summaries of the law and been widely distributing Know Your Rights (KYR) materials. We are regularly sharing information over social media, including by creating video content where we answer questions. We have also recorded interviews for radio stations that target immigrant communities in Iowa explaining S.F. 2340.

40. We continue our proactive advocacy efforts. We organized a call to action on May 1, International Worker's Day; we brought in speakers to discuss S.F. 2340, and shared information on the new law. We are also building a database of statements in opposition to S.F. 2340.

41. All of this work has already taken our small staff away from our core grassroots community outreach. Our organizer staff members typically meet certain performance metrics as part of their work, for example, they are obligated to have six to eight one-on-one meetings each

week with community members and are instructed to host at least one house party for community members each month and to meet quarterly with Iowa MMJ's community committees (groups of members with similar interests). As a result of our ongoing response to S.F. 2340, Iowa MMJ's organizers have struggled to do the one-on-one meetings and outreach activities that are core to our mission and work.

42.  If S.F. 2340 goes into effect, core components of our advocacy practice will have to fundamentally change. Currently, one of our primary areas of advocacy involves working with immigrant victims of discrimination and wage theft. As part of this campaign, our advocacy staff has spent months doing outreach to workers about the possibility of obtaining protection through a new federal process intended to protect from deportation immigrant workers who participate in labor law violation investigations by local, state or federal labor and employment agencies.[14] After we identify individuals who are interested in challenging labor abuses, we plan to have the advocacy team and the legal services team partner to do screenings for eligibility and provide legal clinics. This outreach is challenging, as these worker victims are vulnerable members of society who are afraid to come forward out of fear of retaliation from their employers – for example, through threats of being reported to ICE. These fears will be significantly intensified under S.F. 2340 as local law enforcement officials will double as immigration authorities making victims of crime increasingly distrustful, unwilling to speak out and report labor law violations to local or state labor and employment agencies, and unable to benefit from deferred action protections. This directly frustrates our organizational goals and our specific projects that are directed at empowering victims of crime.

---

[14] https://www.uscis.gov/working-in-the-united-states/information-for-employers-and-employees/dhs-support-of-the-enforcement-of-labor-and-employment-laws

43. In addition to the chilling effect S.F. 2340 has on immigrant communities and victims of crime in particular, it also breaks down community bonds and relationships our organization has dedicated years of advocacy to cultivate. Iowa MMJ's regular programming includes collaborating with local and state officials on various issues including a campaign to create community IDs. Community ID programs are issued in partnership with local governments and are often endorsed by local law enforcement. They are intended to help immigrants and others who are not eligible for state IDs to better integrate into their communities. A primary goal is to help ease interactions with local law enforcement. As a result of S.F. 2340, immigrant community members will be so distrustful of local law enforcement they will hesitate to obtain these IDs if they become available, undermining Iowa MMJ's work to create a more inclusive Iowa.

44. Under S.F. 2340, our KYR work will need to expand significantly. Under this new law, local law enforcement will be authorized to arrest noncitizens based solely on their immigration history and thus the immigrant community will become a target. We will need to expand our KYR trainings across Iowa and modify our existing materials to address the unique aspects of this new law and how it is implemented.

45. This work to counteract the harms caused by S.F. 2340 will continue to take the advocacy team staff away from their traditional community outreach activities. We will also have to step back from our grassroots leadership development work, advocacy efforts regarding workers' rights violations, one-on-one meetings with advocates, and civics engagement activities with new citizens. As a result, S.F. 2340 will undermine Iowa MMJ's work to empower the immigrant and refugee community.

Executed this 8th day of May 2024 in Des Moines, Iowa.

_____

Erica Johnson
Founding Executive Director
Iowa Migrant Movement for Justice