# EXHIBIT D

Declaration of Michael Tupper, Chief of the Marshalltown Police Department

## DECLARATION OF MICHAEL TUPPER,
## CHIEF OF THE MARSHALLTOWN POLICE DEPARTMENT

I, Michael Tupper, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully.

2. Since 2011, I have been Chief of the Marshalltown Police Department in Marshalltown, Iowa. I began my law enforcement career in 1993 as a patrol officer with the Ottumwa Police Department. I served in that department for 11 years, becoming a detective and eventually a sergeant. In 2004, I became Chief of the Nevada, Iowa Police Department and held that position until I assumed my current position in Marshalltown. In addition, I serve on the Board of Directors for the Iowa Network Against Human Trafficking and Slavery, and I am a member of the International Association for Chiefs of Police (I.A.C.P.), Iowa Police Chiefs Association, and graduated from the FBI National Academy in 2010.

3. I submit this declaration to address Iowa's newly enacted reentry and removal law, S.F. 2340, and explain why I believe this law will interfere with my Department's ability to protect the community in Marshalltown.

*Marshalltown and the Marshalltown Police Department*

4. The Marshalltown Police Department employs forty-two sworn police officers and forty-seven employees total. Our job is to provide public safety services to everyone who lives, works, or visits Marshalltown. I instruct my officers to serve our community with passion and compassion. In addition to our traditional law enforcement obligations, our officers routinely respond to community crises and emergency social services needs. In order to be effective in our work, it is essential that the community trusts our officers and views us as a legitimate institution so that they are willing to work with us to keep our community safe.

1

5. Marshalltown is a diverse city with a significant immigrant population. According to the most recent census data, our total population was just under 28,000 and reported census data indicates 35-37% are Hispanic, though new arrivals mean that in reality the percentage is higher. Our school system includes speakers of forty to forty-five different languages. We have a growing refugee population that works in our meat packing plant.

6. The Department has devoted years and significant time and resources to building trust within this diverse community, as an essential part of our work to keep the community safe. We routinely meet with community nonprofits, church organizations, and other community groups. I speak on our local Spanish radio station several times a year to answer questions and share the Department's work. I serve on the community task force focused on supporting the immigrant population. Our Department participates in a community ID program with our community organizations, in which we vet and issue identification documents to community members who are unable to obtain state-issued IDs for a variety of reasons. Community IDs work to make individuals feel a part of our community and can facilitate law enforcement interactions.

7. As part of our community outreach, my officers and I have worked to overcome fears that local law enforcement will engage in immigration law enforcement. In 2006, federal agents raided a meat-processing facility in Marshalltown. The raid broke up families and sowed deep distrust in local law enforcement, even though local law enforcement did not play a significant role in the raid. I have found that for newer immigrants, in particular, the distinction between federal, state, and local law enforcement is not clear – explaining those distinctions is difficult, especially if there is already distrust.

8. When the immigrant community believes that my Department is going to engage in immigration enforcement, it undermines public safety. For example, in 2017, we received a

report of a burglary in progress in the middle of the day. When my officers arrived, they saw signs of forced entry, but the people within the home refused to come out. My officers eventually discovered that the property belonged to people inside the home – they had simply locked themselves out – but they were afraid to come outside when officers arrived because they thought that the federal government had sent the police to deport them.

9. The Marshalltown Police Department has not, to date, engaged in immigration enforcement. In my over thirty years of service, I have never been trained in immigration law. My officers have not received training in immigration law. That has not been our role.

*Impact of S.F. 2340 on Public Safety in Marshalltown*

10. I am deeply concerned about Iowa's new reentry and removal law, which instructs my Department to engage in immigration enforcement. I have a responsibility to enforce the laws – I do not get to choose which laws I enforce – but my Department is not trained or equipped to properly enforce this law. This law will put my Department in conflict with federal authorities. Most importantly, the law will undermine public safety by significantly eroding my Department's relationship with the community we are charged to protect.

11. S.F. 2340 will require my officers to arrest individuals in Marshalltown if they have previously been deported, excluded, removed, or denied admission and remove them to foreign countries. As mentioned, my officers do not have training in immigration law. We also do not have access to the federal databases that contain immigration histories and records. We are not equipped to determine why a noncitizen might have left the United States in the past or the details of their current immigration status. I am concerned that this will lead my officers to make mistakes when enforcing this new law. Moreover, we do not have relationships with foreign

governments which will interfere with our responsibility to enforce removal orders under S.F. 2340.

12. Moreover, it's my understanding that the federal government does not agree that states should be enforcing immigration law in this manner. I have been following the situation in Texas regarding a similar state law and I am concerned that once my Department is tasked with enforcing S.F. 2340, it will bring us into conflict with federal authorities. I am concerned that my officers will interfere with the objectives of federal immigration authorities, by arresting and removing immigrants that federal authorities do not believe should be removed.

13. I am also concerned that tension with the federal government will interfere with our important relationships with other federal law enforcement partners – the Federal Bureau of Investigations, the Bureau of Alcohol, Tabacco, and Firearms, and the Drug Enforcement Administration – with whom we regularly cooperate to combat drug, gun, and human trafficking. Anything that undermines our communication with these agencies will harm public safety.

14. Based on my decades of law enforcement experience, I know that S.F. 2340 will undermine public safety because our immigrant community members will stop reporting crimes. I've already had people calling me and asking if we're going to start showing up to places of employment looking for people without immigration status. They have asked me: Is it ok to call the police? I wish I could say that this law will not apply to people who call to report a crime or who need our emergency protection, but the law includes no such protection.

15. From my thirty years as a police officer, I know that there are people who take advantage of immigrants to facilitate and further serious crimes. They threaten their victims: if you call the police, they will deport you. They use this threat to try to coerce victims into silence. Drug traffickers use this threat to force people to transport drugs. Up until now, I've been able to

convince people that we're not engaged in immigration enforcement. Now I can't say that. S.F. 2340 will undermine all the work my Department has done to gain the trust of the immigrant community in Marshalltown. Victims of sexual violence and domestic violence will stop calling the police when they need our help. Immigrant witnesses to crime will stop reporting it. My Department will be unable to protect our community.

16. It does not appear that the legislators consulted with local law enforcement when they drafted S.F. 2340. If they had, they would have learned that this law will undermine public safety and they would have left immigration enforcement to the federal government, who have the legal authority, expertise, and resources to handle the complex task.

Executed this 3rd day of May 2024 in Marshalltown, Iowa.

Michael Tupper
Chief, Marshalltown Police Department