# EXHIBIT E

## Declaration of Maria Corona, Iowa Coalition Against Domestic Violence

DECLARATION OF MARIA CORONA

I, Maria Corona, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.  I am the Executive Director for the Iowa Coalition Against Domestic Violence (ICADV). I
    assert this declaration based upon my extensive research and professional expertise, garnered
    from over a decade of working directly with the immigrant population, educational career
    and background, and years of direct victim service and advocacy work in the gender-based
    violence field. If called as a witness, I could and would testify competently and truthfully.

**ICADV's Mission and Work**

2.  ICADV is a Section 501(c)(3) nonprofit organization founded in 1985 with its primary focus
    on providing education, training, support, and technical assistance to domestic violence
    service providers throughout Iowa, enabling them to establish emergency and long-term
    housing and other supportive services for victims and their dependents. We also serve as an
    information clearinghouse, primary point of contact, and resource center on domestic
    violence for the state of Iowa.

3.  ICADV works at the intersection of three spheres of work: national policy and the violence
    against women's movement; statewide systems; and local agencies in the front-line providing
    crisis response services.

4.  ICADV's mission is to engage all people in a movement to change the social and political
    systems that perpetuate violence. We do this through education, advocacy, and quality
    services.

5.  As a statewide agency, ICADV brings together diverse stakeholders in various sectors,
    including government agencies, non-profit organizations, law enforcement, healthcare
    providers, the housing sector, and community groups, to coordinate efforts and resources to
    address domestic violence. ICADV's advocacy work supports the development of policies,
    protocols, and procedures to enhance domestic violence intervention and prevention in Iowa.
    We often work with lawmakers and government agencies to ensure that laws and policies
    effectively address the needs of survivors and hold perpetrators accountable.

6.  There are twelve full-time staff at ICADV with a diverse educational background and
    accreditations including two department of justice immigration accredited representatives.
    ICADV staff regularly share their expertise on domestic violence-related issues by
    participating in several national, state, and local community and system-based committees
    such as with the National Network to End Domestic Violence, National Batterers
    Intervention Program Network, Family Planning Council of Iowa, Unauthorized Practice of
    Law Commission through the Iowa Supreme Court, Iowa Death Review Team, and the
    Family Development and Self Sufficiency program (FaDSS), to name a few.

7.  ICADV is a membership-based organization comprised of twenty-two comprehensive victim
    service provider agencies or crime victim centers that serve all ninety-nine counties in the
    state of Iowa. This network of victim service provider agencies operates helplines, shelters,
    and other support services for survivors of domestic violence, providing them with safety

planning, counseling, legal assistance, and other resources that victims may need to rebuild their lives and achieve self-sufficiency.

8. The coalition's primary purpose is to use our expertise to provide our member agencies and other entities with support, technical assistance, training, capacity building, certification, and organizational guidance on issues related to domestic violence in the state of Iowa, as needed/requested.

9. For example, ICADV provides training on confidentiality and victim counselor privilege to member program advocates to ensure they understand and adhere to federal and state regulations in service to crime victim safety and autonomy.  ICADV staff offer culturally relevant technical assistance to address complex survivor needs including navigating the child welfare system, addressing housing discrimination, and creating inclusive policy to meet state and federal standards.  For example, ICADV staff helped shelter-based crisis centers improve accessibility for underserved victims such as LGBTQ+ people, men, and others through policy review and recommendations.

10. ICADV's training team has a combined seventy-five years of experience in the crime victim services field, with a particular focus on gender-based violence. ICADV sets membership standards for direct service provision and certifies compliance with training and supervision requirements for victim counselors, as mandated in Iowa Code 915.20A, to ensure continuity of services and accountability throughout the state. We guide member agencies and those interacting with survivors to facilitate access and assistance to all survivors using trauma-informed and healing-centered practices.

11. ICADV's Legal Clinic Program provides holistic legal representation to victims of domestic violence in Iowa. Since 1994, the Legal Clinic Program has concentrated on providing legal consultations and services for immigrant and refugee victims/survivors of domestic violence, dating violence, sexual assault, trafficking, and stalking who reside in the state of Iowa. This includes consultations and representation of clients applying for immigration relief, such as VAWA (for immigrants abused by a U.S. citizen or permanent resident spouse or parent), U visa (for immigrants who have been victims of certain crimes, including domestic violence and sexual assault), T visa (for victims/survivors of human trafficking), and adjustments of status like green cards/permanent residency petitions. We also support survivors seeking pro-se orders of protection with limited consultation, referrals, and connections to victim service providers for accompaniment and further support.

12. Our staff are trained in trauma-informed representation and view each client as a unique individual who needs a response tailored to their particular experiences, survival strategies and life goals. Our staff also makes warm referrals to our network of member agencies to connect clients with non-legal resources to reach their goals.

## My Role and Background

13. As ICADV's Executive Director, I oversee our organization's programming and strategy, lead our staff, engage with our Board on key governance issues, and ensure that we have adequate resources to carry out our mission.

14. I assumed the position of Executive Director in 2021, following the completion of my Ph.D. In this capacity, I transitioned away from my prior experience in direct service provision to

oversee the delivery of victim services across ICADV's network of direct service providers and members and within our own organization's limited programming. This includes initiatives such as ICADV's Survivor's Achieving Financial Empowerment (SAFE), the Alice Barton Educational Scholarships program, and the Legal Clinic Program.

15. I obtained my Ph.D. in Human Development and Family Studies (HDFS) from Iowa State University of Science and Technology (ISU). My doctoral research focused on the intersection of immigration policy and the health and well-being of immigrant families in Iowa.

16. During my tenure as a full-time graduate student, I engaged in various research projects that facilitated my interaction with numerous immigrant families residing in rural Iowa counties, many of whom had encountered victimization. Leveraging my prior experience as a victim advocate, I offered indispensable safety planning and resource allocation to these individuals. Additionally, I volunteered my time and expertise to several community projects centered on fostering civic engagement and education among Iowa Latino youth.

17. Prior to this, I earned a Master's Degree in Family and Consumer Sciences from ISU in 2017. During this time, my research concentrated on intimate partner violence (IPV) or domestic violence and adverse childhood experiences (ACEs) of men convicted of domestic abuse in Iowa. Furthermore, I hold a Bachelor of Science degree, which I obtained in 2011 with a double major in Latin America Social and Cultural Change and Women's Studies.

18. Throughout my academic journey, I have engaged in various research projects, including the development of an evidence-based culturally responsive conceptual model and guide for professionals working with immigrant survivors of domestic violence.

19. Additionally, I have contributed to ISU Extension and Outreach initiatives such as the Rural Family Speak about Health Project (RFSHP), which received the 2019 National Diversity in Extension Award from the U.S. Department of Agriculture, Cooperative Extension, and the Association of Public and Land-grant Universities. RFSHP was a multi-state longitudinal study of low-income families that live in rural areas, oversampling, or collecting additional data from a specific subgroup, Latina rural immigrant women. The overall project focused on researching the family level characteristics, community interactions, and living environment which impact mental health in diverse rural low-income families.

20. Other projects I have participated in include JUNTOS: Para Una Mejor Educación, a research-based interactive program developed to bring together Latino youth and families to pursue a higher education. More than 400 Latino youth and their parents have participated in JUNTOS across Iowa; Abriendo Caminos: Clearing the Path to Hispanic Health, a multi-state project that contributed to obesity prevention interventions for families from Latin American backgrounds that lived in Iowa, and who were considered low-income and low literacy. This project led to an effective, low-cost obesity prevention strategy.

21. In 2013, I assumed a full-time position as a direct victim service provider at ACCESS, a local shelter and outreach program catering to Greene, Boone, Story, Marshall, and Tama counties. In this capacity, I engaged with hard-to-reach populations residing in rural areas, delivering individual and group counseling sessions to victims of domestic and sexual abuse. Additionally, I spearheaded linguistically and culturally specific outreach efforts and maintained round-the-clock crisis response services to ensure the safety of victims and their dependents. Beyond crisis intervention, I advocated for the housing and economic security of families affected by violence and orchestrated educational events aimed at raising awareness about violence against women and other marginalized groups. Later, I transitioned into a

part-time victim advocate role at ACCESS, assuming responsibility for the shelter and transitional housing facilities.

## **Victim Protections Impacted by SF2340**

22. I understand that on April 10, 2024, Governor Reynolds signed SF2340 into law and that the law is scheduled to go into effect on July 1, 2024. ICADV opposed SF2340 due to concerns that this sweeping legislation will harm immigrant victims of violent crime by undermining access to federal legal protections against deportation in the Violence Against Women Act (VAWA) and specific provisions under the Immigration and Nationality Act (INA).

23. Under the protections introduced in 1994 and 2000 under VAWA, certain immigrant victims who have suffered mental abuse, sexual and other physical abuse, human trafficking, and other qualifying violent crimes can apply for protection against deportation. These protections include the U visa (for individuals who have been victims of certain crimes, including domestic violence and other abuse) and the T visa (for individuals subjected to human trafficking). There is also a VAWA "self petition" process that allows certain victims of abuse by a U.S. citizen or permanent resident spouse or parent to apply for protections from deportation and lawful permanent residency (green card) without requiring sponsorship from their abuser. These provisions were intended to encourage certain immigrant victims of violence to seek help and to work with law enforcement to improve public safety.

24. For example, a victim experiencing domestic violence providing reasonable assistance to law enforcement (reporting a crime, being a witness, providing testimony, etc.) can apply to U.S. Citizenship and Immigration Services (USCIS) for a U visa. They must first receive certification from law enforcement stating that the person was helpful in the investigation of the crime. Law enforcement certification does not guarantee that USCIS will approve the person's U visa application but without law enforcement certification the person is not eligible to proceed with the U visa application. Once they obtain law enforcement certification, the person can then submit an application to USCIS to be considered for a U visa. If USCIS approves the U visa, the person would be protected from deportation and placed on a pathway to lawful permanent residency (a green card). Certain family members of the victim and U visa applicant such as children, may be eligible for a derivative U visa.

25. Federal immigration law also allows immigrant victims of abuse who are married to U.S. citizens or permanent residents to self-petition for permanent residency and eventually citizenship. Typically, a U.S. citizen or permanent resident must "sponsor" an undocumented spouse seeking permanent residency, but in coercive/abusive relationships, federal VAWA law allows a victim to "self-petition" because threatening a spouse with deportation is such a common abuse tactic. To be eligible to file a VAWA self-petition, an individual must demonstrate to USCIS that they have been subjected to battery or extreme cruelty by a U.S. citizen or lawful permanent resident spouse or parent. In cases involving children, the child may also be eligible to file as a derivative beneficiary.

26. Victims who are applying for a VAWA self-petition must provide evidence to support their claims of abuse, which may include police reports, medical records, court documents, affidavits from witnesses, photographs, and other relevant documentation. There are confidentiality protections ensuring information shared with the government is not shared with the abuser, which help keep survivors protected from further harm or retaliation. A

work-authorization may be provided while the victim's petition is pending allowing victims and their dependents to access financial independence and resources while they wait for USCIS to adjudicate their self-petition.

27. Human trafficking predominantly impacts women and girls, as such, another federal immigration law benefit, called the T visa, provides crucial protection from deportation, and allows victims of human trafficking to obtain a legal pathway to stay in United States if they meet certain requirements, including complying with reasonable requests from law enforcement to assist in the investigation or prosecution of their traffickers.

28. T visas empower women and girls to seek justice and rebuild their lives without fear of deportation or more harm from their trafficker. T visas help victims escape horrendous abuse and access necessary services, including medical care, counseling, and legal assistance. Again, this is another tool that encourages collaboration between law enforcement, victim service providers, and advocacy organizations in addressing and supporting survivors.

29. All of these federal immigration law provisions were enacted to provide a pathway to safety and independence for victims of violent crime, including those who may otherwise be trapped in an ongoing abusive situation due to their immigration status. These protections are important forms of relief from abuse for victims of domestic and sexual abuse, dating violence, and trafficking. By providing victims a pathway to lawful immigration status in the United States, these forms of relief offer an opportunity for victims to break free from abusive situations, protect themselves and their children, regain independence, access services, and support the overall public safety of the communities they live in.

30. SF2340 thwarts the purpose of federal law protections for immigrant victims of violence. These federal law protections were enacted to protect victims from abusers who routinely use their immigration status to harm them, e.g., threatening to have them deported if they report the abuse to the police. SF2340 would deter victims from seeking safety options and jeopardizes the safety of victims waiting for final determinations of their application.

31. Under U or T visa protections for example, the risk for a victim is that they must proactively report to law enforcement, thereby revealing their immigration status, in exchange for potential protection from deportation. SF2340 not only deters anyone from reporting to law enforcement in the first place but harms victims who have already given their information to law enforcement, who would now be enabled under this law to arrest and deport them while their visa application is pending or even after they have received U or T nonimmigrant status or even a green card.

32.  Similarly, as discussed above, federal immigration law allows immigrant victims of abuse who are married to U.S. citizens or permanent residents to self-petition for permanent residency and eventually citizenship. But under SF2340, a victim married to an abusive U.S. citizen could be deported by Iowa while their VAWA self-petition application is pending or even after they have been granted VAWA relief or a green card. This would defeat the purpose of federal immigration law, which seeks to protect from deportation victims of abuse who are married to U.S. citizens or permanent residents.

33. SF 2340 discourages victims from seeking help and engage law enforcement, because although doing so is necessary to obtain certain federal immigration relief, it would now expose them to potential jail time and removal under SF 2340.

34. The purpose of these federal immigration law protections is to promote public safety and encourage immigrant victims to seek help, access the justice system by cooperating with law enforcement in the investigation or prosecution of the crime, and hold perpetrators accountable for their actions. VAWA self-petitions, U visas, and T visas are critical for the safety of victims of domestic violence, sexual assault, and trafficking and function as an avenue for prevention of revictimization. For example, victims of gender-violence and qualifying crimes that receive these federal law protections can access supportive services, find economic independence, provide for their dependents, and achieve self-sufficiency and autonomy.

35. SF2340 completely negates the purpose of federal law protections from violence. It jeopardizes the safety of survivors with pending applications because they have freely given their contact information to authorities with the understanding it could lead to protection, not further harm. It also eliminates any incentive for victims to report abuse to law enforcement and seek safety, while proactively giving abusers another tool to weaponize against victims.

36. SF2340 gives abusers leverage over federal immigration policy, providing them with another means to exert control and inflict harm upon their victims in Iowa. This legislation could empower abusers to manipulate or coerce victims by threatening to report them, directly or indirectly, to state or local law enforcement. Such actions could undermine federal protections in place for victims of abuse.

37. Research and scholarship consistently validate that abusers often exploit the legal system to intimidate and control immigrant victims[1] . For instance, they may threaten to report victims to authorities, resulting in potential housing repercussions or separation from children, and deportations[2][3].

38. SF2340 undermines public safety by creating a deterrent effect on crime reporting to law enforcement, thereby enabling perpetrators to evade accountability and perpetuate their abusive behavior unchecked. Given that domestic violence poses a significant threat to public safety, its ramifications extend beyond individual victims and have broader implications for the community at large. Domestic violence often escalates and spills over into public spaces, posing risks to bystanders and creating a climate of fear and insecurity within the community.

### SF 2340 Harms ICADV's Victim Support Services and Victim's Lives

39. SF 2340 will undermine and actively work against ICADV's mission and victim support services. It will impact our primary focus areas and the direct victim support we offer to immigrant victims of domestic violence, sexual assault, dating violence, trafficking, and stalking. As a result, immigrant victims in Iowa will be significantly harmed.

---

[1] Reina, A.S., & Lohman, B.J. (2015). Barriers preventing Latina immigrants from seeking advocacy services for domestic violence victims: A qualitative analysis. *Journal of Family Violence, 30*(4)*, 479-488*

[2] Raj, A., & Silverman, J. (2002). Violence against immigrant women: The roles of culture, context, and legal immigrant status on intimate partner violence. *Violence Against Women 8*(3), 367-398

[3] Erez, E., & Globokar, J. (2009). Compounding vulnerabilities: The impact of immigration status and circumstances on battered immigrant women. *Immigration, Crime and Justice (Sociology of Crime, Law, and Deviance, Vol. 13)*, 129-145. Emerald Group Publishing

40. Because SF 2340 will negatively impact victims' ability to call for help and apply for protections such as U visas, T visas, VAWA self-petitions, and other forms of lawful immigration status, it will make representing our clients more difficult, if not impossible.

41. Most of the victims served by ICADV's Legal Clinic Program have a removal order or reentry, significantly impacting ICADV's legal program and victim services under SF 2340.

42. For example, ICADV's Legal Clinic Program staff will have to make strategic and potentially high-risk determinations when advising clients whether to file for a U visa, T visa, and VAWA self-petition adjustments of status because doing so will now involve the danger of arrest and deportation under SF 2340. There would be significant ethical considerations for ICADV staff to weigh as they assist victims in initiating the U visa, T visa, or VAWA self-petition application process once SF2340 goes into effect because it would jeopardize victim safety by putting them at risk of deportation and separation from their families.

43. A great number of victims served by ICADV's Legal Clinic Program also have asylum cases rooted in gender-based violence in their countries of origin, including domestic violence, incest, sexual exploitation, to name a few. SF 2340 places these clients at heightened danger of victimization if deported.

44. SF 2340 will also create ethical considerations for ICADV in promoting public safety by asking immigrant victims to call law enforcement for help due to the conflicting roles of law enforcement personnel under the law. Law enforcement will now be charged both with assisting victims and protecting community safety, while also enforcing SF 2340, a state law that conflicts with the immigration protections offered to victims under federal law.

45. Just as SF 2340 thwarts the purpose of federal law protections for immigrant victims, it also undermines immigrant survivor access to state law protections against violence and creates additional ethical considerations for ICADV staff in counseling immigrant survivors regarding their options for safety and support. Iowa's Right to Assistance law is meant to protect victims from housing related retaliation if they call police for assistance or in an emergency. However, SF 2340 jeopardizes these protections by threatening immigrant victims of domestic violence with the possibility of deportation and family separation for contacting the police.

46. Additionally, ICADV's training programming will also be impacted by SF 2340. ICADV trains victim advocates on the legal protections available to victims of domestic violence. SF 2340 complicates such trainings because of the potential exposure of immigrant victims of domestic violence to new risks of incarceration, deportation, and further harm if they seek help, which undermines core principles of safety and protection under the Rights to Assistance law.

### Survivor Story

47. A victim and client of ICADV, Lucia[4], experienced domestic violence in 2016. Lucia has a prior executed removal order and reentered the United States. Lucia experienced several forms of abuse by her husband and father of her children, such as physical, sexual, and financial abuse for approximately a decade. She eventually connected with a local victim advocate and developed a safety plan and received other emotional support. In this safety plan, Lucia had planned to call law enforcement for help when she feared for her safety.

---

[4] Pseudonym used to protect our client's identity due to the sensitive nature of the information discussed.

48. Lucia called local law enforcement for help in an incident in which she was being strangled by her abuser. A criminal no-contact order was placed against him by the court.

49. Lucia began actively assisting in the investigation; she felt trust in law enforcement and in the system, and her participation in the investigation ultimately led to the perpetrator's arrest. Since the report was made, she consistently cooperated with law enforcement.

50. Lucia is also a mother to children born in the United States, citizens now highly ranked service member in a U.S. military branch. Despite facing numerous challenges, such as not having a formal education, lack of English proficiency, and being a low-income individual and a single parent, she applied for a U visa. She met all requirements and continued to assist law enforcement and other legal system authorities.

51. Five years later, the U visa that Lucia applied for was approved. She navigated this entire time with unstable protections and fear, yet was able to support her children and allow them to achieve their military dreams serving the U.S.

52. As of this year she can began the permanent residency process. However, after eight years of collaboration and unique protections as a victim of a violent crime, SF 2340 poses a threat to her and her family's safety. Her immigration history places her at high risk under SF 2340 and she can lose everything she has accomplished post-victimization.

53. One of the requirements for obtaining permanent residency is that Lucia continues to cooperate with law enforcement in the investigation of the crime. If law enforcement were to ask Lucia for further assistance, her prior removal order and reentry could come to light, putting her at risk of removal under SF 2340. If Lucia did not respond to a law enforcement request for assistance due to fear of being prosecuted under SF 2340, she could jeopardize her possibilities for obtaining permanent residency under the U- Visa.

54. SF 2340 endangers Lucia, putting her at risk of removal and increased harm for her and her family. This not only inflicts personal harm but also erodes trust in a system she relied on, undermining federal laws and the protection promised to crime victims aiding investigations or prosecutions.

## Impact on the Lives of Victims ICADV Serves and Immigrant Victims in Iowa Overall

55. Laws like SF 2340 will have a devastating impact on people who have clearly been victims of abuse and now face becoming victims of SF 2340.

56. A plethora of peer reviewed research articles provide evidence that immigrant victims find it hard to call law enforcement for help due to lack of trust in law enforcement and legal systems, concerns about confidentiality and privacy, trauma and stigma, fear of immigration enforcement, language and cultural barriers, and lack of awareness of rights and services available[5]. We have seen these fears firsthand when working with immigrant victims at ICADV. SF 2340 will make cooperation between a specific and already underserved group of victims and law enforcement nonexistent. SF 2340 will create more panic and fear in immigrant victims of domestic violence, sexual assault, dating violence, and trafficking.

---

[5] Robinson, S. R., Ravi, K., & Voth Schrag, R. J. (2021). A Systematic Review of Barriers to Formal Help Seeking for Adult Survivors of IPV in the United States, 2005–2019. *Trauma, Violence, & Abuse*, *22*(5), 1279-1295.

With less victims reporting crimes, the result will be deterred perpetrator accountability and convictions, increasing harmful and potentially deadly situations for victims and the public.

57. In our experience, immigrant victims of crime and human trafficking, including ICADV's clients, struggle to report the crime out of fear of deportation and family separation. Many times, ICADV staff works hard to encourage victims to seek law enforcement help and make formal reports. SF 2340 makes it harder for ICADV staff to encourage victims of crime to make reports or call law enforcement for help because doing so can now result in their deportation.

58. SF 2340 will also increase the vulnerability of immigrant victims of gender-based violence since their abusers typically use a pattern of control and coercive tactics tied to immigration status and histories. This is true for ICADV's clients as well. As a result of SF 2340, domestic violence, and other gender-based violent crimes will increase and the risk of femicide in Iowa will unquestionably increase.

59. Many victims that ICADV serves and across Iowa have U.S.-born citizen children who depend on them, and SF 2340 will create more complicated issues for these families to remain together, safe, and away from the foster care system. Children will be traumatized if their immigrant parents are deported, and additional burdens will be placed on the state by children's entry into the child welfare system, not from having unfit parents but from the application of SF 2340.

60. Many survivors across Iowa and clients of ICADV already have legal temporary or permanent residency or other protected status, with certain inadmissibility -- such as reentries -- that have already been waived by USCIS. Even though these inadmissibility factors no longer count against our clients in their immigration cases because they have been forgiven by the federal government, SF 2340 would punish these immigrant victims with criminal sentencings, fees, and deportation for the same conduct.

61. SF 2340 will increase discrimination, violence against women and other marginalized groups. Lastly, it will undermine public safety, justice, and the well-being of victims and immigrant families across Iowa.

62. Responding to domestic abuse and creating safe communities requires a comprehensive and coordinated approach that addresses the unique needs and challenges faced by immigrant victims while upholding principles of equality, dignity, and justice for all. SF 2340 harms immigrant survivors of abuse and stands in the way of these goals.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th of April 2024 in Des Moines, Iowa.

*Maria B. Corona*

Maria B. Corona, PhD.