# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

No. 24-2263

Iowa Migrant Movement for Justice, et al.

Appellees

v.

Brenna Bird, in her official capacity as Attorney General of Iowa

Appellant

Kimberly Graham and Zach Herrmann

------------------------------

Immigration Reform Law Institute, et al.

Amici on Behalf of Appellant(s)

ASISTA Immigration Assistance, et al.

Amici on Behalf of Appellee(s)

_____

Appeal from U.S. District Court for the Southern District of Iowa - Central
(4:24-cv-00161-SHL)

_____

## ORDER

    The petition for rehearing en banc is denied. The petition for rehearing by the panel is also denied.

    Judge Stras would grant the petition for rehearing en banc.

STRAS, Circuit Judge, with whom LOKEN, Circuit Judge, joins as to Part III, dissenting from the denial of rehearing en banc.

Access to *legal* immigration, which allowed my grandparents to settle here following World War II, has been a lasting gift for my family. *See* David R. Stras, *What My Grandparents' Experiences in the Holocaust Taught Me About the First Amendment*, 15 N.Y.U. J. L. & Liberty 476, 484 (2022) (explaining that "it is no accident that my grandparents ended up here"). The welcome mat we offer to those who come here legally, however, means little if skipping the line results in the same (or even better) treatment. Now, as the federal government tries to enforce the nation's immigration laws, Iowa wants to help. *See* Iowa Code §§ 718C.1–.10. If it can do so without getting in the way, I would let it.

I.

Let's be clear about what happened here. Two people, plus an organization purporting to speak for two others, set out to defend the federal government from Iowa's alleged overreach. The problem, in their view, was that Iowa made it a crime for aliens to set foot in the state if they had ever been "excluded, deported, or removed from the United States." *Id.* § 718C.2(1)(a). The remedy was what the federal government had already decided to do once before: make them leave the country. *See id.* § 718C.4(4); 8 U.S.C. § 1231(a); *see also Arizona v. United States*, 567 U.S. 387, 399–400 (2012) (summarizing when "[s]tate law must . . . give way to federal law"). In short, it mandated self-deportation. *See* Iowa Code § 718C.4(4).

The parties have diametrically opposed views of what the law does: Iowa sees it as a helping hand; the plaintiffs as encroaching on federal authority. The federal government, for its part, dropped its own parallel challenge in a companion case. *See* Order, *United States v. Iowa*, No. 24-2265, 2025 WL 1140834 (8th Cir. Apr. 15, 2025) (acknowledging that the United States "unilaterally dismiss[ed] the case"). And it has given us assurances that, as far as it is concerned, Iowa's efforts actually "*further* the purposes of federal immigration law."

Despite these developments, the plaintiffs won a preliminary injunction. Not just any injunction, but one that appears to prohibit enforcement of the law against

*anyone*. *See Rodgers v. Bryant*, 942 F.3d 451, 460 n.5 (8th Cir. 2019) (Stras, J., concurring in part and dissenting in part) (discussing what makes an injunction "universal"). Fortunately, the panel sent that part back. *See Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 930–31 (8th Cir. 2025) (remanding for the district court to ensure that the injunction is no "broader than necessary to provide complete relief to each plaintiff with standing to sue" (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025))); *see also Rodgers*, 942 F.3d at 466 (Stras, J., concurring in part and dissenting in part) (arguing that protecting individual plaintiffs from a potentially unconstitutional statute does not "somehow depend[] on preventing enforcement . . . against everyone else"). But we should have reversed the rest too, because the overbroad injunction was far from the only problem with this case.

II.

The first was deciding it at all. It is a preemptive preemption lawsuit filed by private parties who want to prevent state prosecutions, not a defense to a criminal action that Iowa has already brought. *Cf. Kansas v. Garcia*, 589 U.S. 191, 200–01 (2020) (addressing defensive preemption claims). To get "preenforcement review of a criminal statute," the plaintiffs must clear several hurdles. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 15 (2010). One is showing "a credible threat of prosecution." *Id.* (citation omitted); *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (explaining that a "future injury" can support standing if it "is certainly impending[] or there is a substantial risk that [it] will occur" (citation omitted)). The existence of a credible threat is what makes an injury "actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List*, 573 U.S. at 158 (citation omitted). Without one, no "justiciable case or controversy" exists.[1] *Humanitarian L. Project*, 561 U.S. at 15.

What the allegations show is that Iowa *might* enforce the law against *someone* at *some* point, not that these plaintiffs are "actual[ly] or imminent[ly]" at risk. *Susan*

---

[1] Although Iowa does not raise standing as a reason to rehear the case, other states do in an amicus brief. And even if they had not, we have an "independent duty" to police our own jurisdiction. *See ACLU Neb. Found. v. City of Plattsmouth*, 419 F.3d 772, 775 n.4 (8th Cir. 2005) (en banc).

*B. Anthony List*, 573 U.S. at 158 (citation omitted). In fact, the complaint does not discuss investigations, charges, or threats of prosecution against *anyone*, let alone them. *Cf. id.* at 164 ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not chimerical." (citation omitted)); *Humanitarian L. Project*, 561 U.S. at 16 (emphasizing that the government had already brought "about 150" other cases, "several of [which] involved the enforcement of the statutory terms at issue"). The complaint does not even say how the Attorney General or county prosecutors interpret the law, much less who they plan to arrest and charge. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411 (2013) (rejecting a theory of standing that rested on "speculat[ion] and . . . assumptions" about the government's "targeting practices"); *cf. Monson v. DEA*, 589 F.3d 952, 958 (8th Cir. 2009) (concluding there was standing based on a letter in which the government "plainly state[d]" its position). The plaintiffs did not need to say much, but they pleaded even less.

Less is not more, even drawing all inferences in their favor. *See GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 667 (8th Cir. 2024). Allegations that the individual plaintiffs "enter[ed]" and might be "found in" Iowa after "ha[ving] been excluded, deported, or removed from the United States" may be enough to bring them within the plain language of the statute. Iowa Code § 718C.2(1)(a). But engaging in "conduct arguably . . . proscribed by a statute" is not enough on its own to bring a pre-enforcement challenge. *Susan B. Anthony List*, 573 U.S. at 159 (citation omitted). Especially when the state has consistently argued that an exception applies.[2] *See Missouri v. Yellen*, 39 F.4th 1063, 1069 (8th Cir. 2022) (holding that there was no injury when the relevant authorities "ha[d] never endorsed or adopted" the challenged interpretation).

Take *Susan B. Anthony List* as an example. There, the Supreme Court spent several pages discussing "the threat of future enforcement," which it characterized as "substantial," despite having already concluded that the relevant statute "swe[pt]

---

[2]As for "David," the member who supposedly provides representational standing to the Iowa Migrant Movement for Justice, the complaint is silent about his *other* contacts, if any, with Iowa or whether he has lived in the state since graduating high school in 2007. Even "assum[ing] the . . . allegations are true," I would not just jump to the conclusion that David faces a threat of prosecution. *GLBT Youth in Iowa Schs. Task Force*, 114 F.4th at 667.

broadly" and "cover[ed]" what the plaintiffs "intended" to do. 573 U.S. at 162, 164–67 (highlighting, among other things, "past enforcement," a "prior probable-cause finding," and a refusal to "disavow[] enforcement"). If falling within the statute were enough on its own, there would have been no reason to discuss what made the threat of enforcement against them credible. *See id.* at 159. The lesson is that, in a pre-enforcement challenge, plaintiffs must allege *both* conduct "proscribed by . . . statute" and "a credible threat of enforcement." *Id.* (citation omitted); *see id.* at 158 (explaining that "[e]ach element [of standing] must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation" (citation omitted)).

The panel all but ignored the second requirement based on a pair of cases. *See Iowa Migrant Movement for Just.*, 157 F.4th at 914–15. In one, *Alexis Bailly Vineyard, Inc. v. Harrington*, we said that, "when a course of action is within the plain text of a statute, a credible threat of prosecution exists." 931 F.3d 774, 778 (8th Cir. 2019) (citation omitted). But there, unlike here, no one disputed that the plaintiffs' activities fell within the plain language of the statute and that they had previously been "require[d]" to request exemptions. *Id.* at 777–78. Enforcement, in other words, was just a matter of time. *See id.* at 778 (noting that "a perpetual exception" was implausible). Just as importantly, the plaintiffs in that case were experiencing "reduced borrowing power, operational efficiencies, and marketing opportunities," all "concrete economic loss[es]," so they did not need a future enforcement threat to state an Article III injury. *Id.* at 779.

The second case, *Turtle Island Foods, SPC v. Thompson*, is even less helpful. 992 F.3d 694 (8th Cir. 2021). It "involve[d] the chill of allegedly protected First Amendment expression," which led to the application of a "forgiving" and "lenient" version of standing. *Id.* at 699–700 (citation omitted). With no First Amendment claims here, no chilling effect could possibly provide a shortcut to standing. *Cf. Henderson v. Springfield R-12 Sch. Dist.*, 163 F.4th 478, 492 (8th Cir. 2025) (en banc) (declining to say whether the test *should* be "more lenient" in First Amendment cases).

The point is that, outside the First Amendment context, a "credible," "substantial," and "sufficiently imminent" threat of prosecution is a requirement, not

a suggestion, for a pre-enforcement challenge. *Susan B. Anthony List*, 573 U.S. at 158–59 (citations omitted). It was a mistake for the panel to overlook it.

### III.

Another one was concluding that these yet-to-be-affected plaintiffs were "*likely* to prevail on the merits." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 733 (8th Cir. 2008) (en banc) (emphasis added) (adopting a "more rigorous standard" for "preliminary injunctions that thwart a state's presumptively reasonable democratic processes"). They went for broke by bringing a facial challenge to Iowa's illegal-reentry law, presumably to get a ruling preventing its application against anyone. Had the panel applied the correct standard for facial challenges, it would have been a bad gamble. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (explaining that the choice to challenge a statute on its face "comes at a cost"); *United States v. Veasley*, 98 F.4th 906, 909 (8th Cir. 2024) ("The stakes are higher . . . , so the bar goes up . . . .").

### A.

"A facial challenge is really just a claim that the law . . . at issue is unconstitutional in all its applications." *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019); *see Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008) (warning that facial challenges "often rest on speculation" and "threaten to short circuit the democratic process"). To describe them as "hard to win" would be an understatement. *NetChoice*, 603 U.S. at 723. They are "the '*most difficult* challenge[s] to mount successfully'" because the existence of "some" constitutional applications defeats them. *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (emphasis added) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see id.* (rejecting a facial challenge because "the provision [wa]s constitutional as applied to the facts of Rahimi's own case").

The hill is even steeper than it looks. It requires proof of a negative: "no set of circumstances . . . under which [Iowa's statute] would be valid." *Salerno*, 481 U.S. at 745. "In effect, [the plaintiffs must] speak[] for a range of people," *Veasley*, 98 F.4th at 910, from green-card-holding waiver recipients to "revolving[-]door"

recidivists, *United States v. Mejia-Perez*, 635 F.3d 351, 353 (8th Cir. 2011), and violent drug traffickers, *see United States v. Paulino-Duarte*, 670 F.3d 842, 842–43 (8th Cir. 2012). A preliminary injunction only becomes an option if the plaintiffs are "likely" to show that every application, including each of those, is unconstitutional. *Planned Parenthood Minn.*, 530 F.3d at 732; *see id.* at 732 n.5 (noting that "a likelihood of success on the merits" is just "one, but not the only, threshold showing").

B.

Not all are, because the most obvious application is also the most obviously constitutional: the state prosecution of an individual who has committed the crime of illegal reentry under federal *and* state law. *See* 8 U.S.C. § 1326(a); Iowa Code § 718C.2(1). Both, after all, prohibit identical conduct: reentry by aliens who "ha[ve] been denied admission, excluded, deported, or removed or ha[ve] departed the United States while an order of exclusion, deportation, or removal is outstanding." 8 U.S.C. § 1326(a); *accord* Iowa Code § 718C.2(1). If no federal exception applies, then it is possible to comply with each, and a state prosecution does not "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (citation omitted). To the contrary, it furthers it.

Indeed, this sort of criminal-law "overlap," a feature of federalism "[f]rom the beginning," would "not even begin" to support preemption. *Kansas*, 589 U.S. at 211–12; *see Arizona*, 567 U.S. at 422 (Scalia, J., concurring in part and dissenting in part) (describing "the States' traditional role in regulating immigration" and "sovereign prerogative to do so"). Preemption *could* occur if state officials pursue charges against aliens who are under no federal obligation to leave the country. *See Kansas*, 589 U.S. at 212. *But see id.* ("The Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." (quoting U.S. Const. art. VI, cl. 2)). But given that federal and state interests align in "at least some" cases, the only type of challenge that can work is an as-applied one. *Salerno*, 481 U.S. at 751 (citation omitted); *see Kansas*, 589 U.S. at 212 ("[I]n the vast majority of cases where federal and state laws overlap, allowing the States to prosecute is entirely consistent with federal

interests."). Case-by-case adjudication then becomes the mechanism for defining the limits of state power. *See United States v. Cooper*, 127 F.4th 1092, 1097 (8th Cir. 2025) (requiring the district court "to figure out which side of the [constitutional] line [each] case falls on").

Or at least that is how the system is supposed to work. *See NetChoice*, 603 U.S. at 723 (explaining that "courts usually handle constitutional claims case by case, not en masse"). By completely ruling out Iowa's "parallel scheme of enforcement," the panel opinion short-circuits this process. *Iowa Migrant Movement for Just.*, 157 F.4th at 922. It purports to apply conflict preemption, but in truth it applies a Frankensteinian hybrid: something it calls "conflict preemption" but that more closely resembles field preemption. *Id.* at 919–27. Only field preemption, after all, can block "parallel" and "complementary state regulation." *Arizona*, 567 U.S. at 401; *see id.* at 402 (explaining that "the basic premise" is "that States may not enter, *in any respect*, an area the Federal Government has reserved for itself" (emphasis added)).

The panel's patchwork analysis even confused the plaintiffs, who now try to defend the decision on field-preemption grounds. *See* Opposition to Petition for Rehearing En Banc, at 13 ("Defendant says the panel implicitly found field preemption . . . ; to the extent that it did, it was plainly correct."). The problem, of course, is that the application of field preemption is hard to square with *Arizona*, which allowed the state to enforce one immigration statute but not others. *See* 567 U.S. at 416; *id.* at 438 (Thomas, J., concurring in part and dissenting in part) (noting that "recent cases . . . frequently rejected field pre-emption in the absence of statutory language expressly requiring it" (citation omitted)); *see also Kansas*, 589 U.S. at 208 (emphasizing that it is "rare").

The one that survived required state officers to try "to determine the immigration status" of anyone they lawfully stopped and suspected of being an illegal alien. *Arizona*, 567 U.S. at 411 (majority opinion) (quoting Ariz. Rev. Stat. § 11-1051(B)). If the federal government occupied the entire field of "immigration policy" or "entry and removal," then this provision should have been preempted. *See id.* at 401; *id.* at 414–16 (concluding that it "survive[d] pre-emption," leaving as-applied challenges as the only option); *cf. Keller v. City of Fremont*, 719 F.3d

931, 941–42 (8th Cir. 2013) (rejecting a facial-preemption theory that defined the "federally occupied 'field'" as "alien removal"). And it would have spared the Supreme Court the trouble of addressing the other Arizona provisions individually, including those that turned out to be *conflict* preempted.³ *See Arizona*, 567 U.S. at 403–10.

Even as to those, the Supreme Court's analysis does not support what the panel did here. The Court reviewed one that made it a crime for illegal aliens to "solicit . . . or perform work," which "Congress [had] made a deliberate choice not to" criminalize. *Arizona*, 567 U.S. at 403–05 (quoting Ariz. Rev. Stat. § 13-2928(C)). Another let state officers arrest aliens they suspected of a removal-triggering "public offense," which was "greater authority" than Congress gave "trained federal immigration officers." *Id.* at 407–08 (quoting Ariz. Rev. Stat. § 13-3883(A)(5)). Unlike both of those, Iowa's statute is nearly a mirror image of federal law, meaning that any conflict will quite literally be the exception, not the rule.⁴

\*   \*   \*

I doubt federally approved prosecutions are the only constitutional application. I cannot imagine, for example, that an order returning an illegal reentrant "to the foreign nation from which [he or she] entered," Iowa Code § 718C.4(4), conflicts when federal authorities have already made the same call, *see* 8 U.S.C. § 1231(b). To the extent other circumstances pose a greater risk of conflict, "those are details relevant to an as-applied challenge, not a facial one." *Veasley*, 98 F.4th at 918. All we need to know is that the existence of "some" constitutional applications is enough to foreclose a facial challenge to Iowa's illegal-reentry law.

---

³One was field preempted, though it dealt with alien registration, which is not at issue here. *See Arizona*, 567 U.S. at 400–03.

⁴Indeed, Iowa peace officers have the authority, even aside from Iowa Code § 718C.2(1), to arrest those suspected of illegal reentry. The offense just comes from federal law. *See* Iowa Code §§ 701.2, 804.7(1)(a)–(c); 8 U.S.C. § 1357(a)(5); *see also United States v. Di Re*, 332 U.S. 581, 589 (1948) (holding that, unless federal law says otherwise, states can authorize their officers to make arrests for federal crimes).

*Rahimi*, 602 U.S. at 693; *see Arizona*, 567 U.S. at 415 (leaving the door open for "other pre-emption and constitutional challenges to the law as interpreted and applied after it goes into effect"); *cf. FCC v. Pacifica Found.*, 438 U.S. 726, 743 (1978) (plurality opinion) ("Invalidating any rule on the basis of its hypothetical application to situations not before the Court is strong medicine to be applied sparingly and only as a last resort." (citation omitted)).

IV.

Entertaining non-justiciable controversies and ignoring constitutional applications of state laws is bad enough under normal circumstances. But making these kinds of mistakes here handcuffs government officials who are trying to enforce the nation's immigration laws. When federal officers are the ones doing it, some courts have claimed overreach. *See, e.g.*, *Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850, 897 (C.D. Cal.), *stayed by* 146 S. Ct. 1 (Sept. 8, 2025). When they decide to bring in backup, the government needs to check all the right boxes first. *See Trump v. Illinois*, No. 25A443, 2025 WL 3715211 (U.S. Dec. 23, 2025) (refusing to stay "a temporary restraining order barring the federalization and deployment of the [National] Guard in Illinois"). And now, if states step up to fill the void, the panel opinion sends the message that it is not their job. *See Iowa Migrant Movement for Just.*, 157 F.4th at 912–13.

Who is left to deal with "the admission and exclusion of foreign nationals . . . [,] a fundamental sovereign attribute" that is supposed to be "exercised by the Government's political departments largely immune from judicial control"? *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (citation omitted); *see Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893) (recognizing that the authority "to exclude or to expel . . . aliens" is the "inherent and inalienable right of every sovereign and independent nation"). More and more, the answer seems to be *nobody*. Not the federal government, not the states, nor anyone else.

We have a duty to rehear "questions of exceptional importance" en banc, particularly when a panel's resolution of them "conflicts with . . . decision[s] of the United States Supreme Court." Fed. R. App. P. 40(b)(2)(B), (D). This one is about

as important as it gets. *See Arizona*, 567 U.S. at 415 ("Immigration policy shapes the destiny of the Nation.").

February 04, 2026

Order Entered at the Direction of the Court:
Clerk, U.S. Court of Appeals, Eighth Circuit.

_____
              /s/ Susan E. Bindler